732 A.2d 1063

NEW JERSEY COALITION OF HEALTH CARE PROFESSIONALS, INC., PHYSICIANS FOR QUALITY CARE, INC., PHYSICIANS UNION OF NEW JERSEY, LOCAL LODGE 8 AND NEW JERSEY ASSOCIATION OF OSTEOPATHIC PHYSICIANS & SURGEONS, APPELLANTS, v. NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE, DIVISION OF INSURANCE, RESPONDENT.

---

ASSOCIATION OF TRIAL LAWYERS OF AMERICA—NEW JERSEY, APPELLANT, v. NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE, DIVISION OF INSURANCE, RESPONDENT (TWO CASES).

---

CHIROPRACTIC AMERICA, MONMOUTH COUNTY, SOUTH JERSEY, NORTHERN JERSEY AND CUMBERLAND COUNTY CHIROPRACTIC SOCIETIES, APPELLANT, v. NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE, DIVISION OF INSURANCE, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 12, 1999—Decided June 14, 1999.

212

Before Judges KING, WALLACE and FALL.

*Alma L. Saravia*, argued the cause for appellants New Jersey Coalition of Health Care Professionals, Inc., Physicians for Quality Care, Inc., Physicians Union of New Jersey, Local Lodge 8, and New Jersey Association of Osteopathic Physicians & Surgeons (*Duane, Morris & Heckscher*, attorneys; *Ms. Saravia* and *Michael W. O'Hara*, on the brief).

*James Katz*, argued the cause for appellant Association of Trial Lawyers of America—New Jersey on both appeals (*Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano*, attorneys; *Mr. Katz*, on the brief in A–2637–98T3; *Mr. Katz* and *Edward N. Adourian*, on the brief in A–2638–98T3).

*Robert A. Jaffe* of the Texas Bar, admitted *pro hac vice*, argued the cause for appellant Chiropractic America, Monmouth County, South Jersey, Northern Jersey and Cumberland County Chiropractic Societies (*Edward S. Hochman* and *Mr. Jaffe*, attorneys; *Mr. Jaffe* and *Mr. Hochman*, on the brief).

*Allison E. Accurso*, Assistant Attorney General, and *Doreen J. Piligian*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *James Bennett*, Deputy Attorney General; on the brief in A–2637–98T7; *Mark Turner Holmes*, Deputy Attorney General, on the brief in A–3047–98T3; *Paul Witko*, Deputy Attorney General, on the brief in A–2558–98T3 and A–2638–98T3 and *Ms. Piligian*, on the briefs).

*Thomas P. Weidner*, argued the cause for Intervenors National Association of Independent Insurers, American Insurance Association, Insurance Council of New Jersey and Alliance of American Insurers (*Jamieson, Moore, Peskin & Spicer*, attorneys; *Mr.Weidner*, of counsel; *David F. Swerdlow, Michael J. Canavan, David G. Glazer* and *Mr. Weidner*, on the brief).

*Barry D. Epstein* and *Gerald H. Baker*, argued the cause for amicus curiae New Jersey State Bar Association (*Baker, Garber, Duffy & Pederson; Mr. Baker, Mr. Epstein* and *Daniel M. Waldman*, on the brief).

*Bruce H. Stern*, argued the cause for amicus curiae Brain Injury Association of New Jersey (*Stark & Stark*, attorneys; *Mr. Stern*, on the brief).

*Joshua L. Prober*, argued the cause for amicus curiae American Osteopathic Association (*McCullough, Campbell & Lane* and

*Kraemer, Burns, Mytelka, Lovell & Kulka,* attorneys; *Mr. Prober* and *Wayne D. Greenfeder,* of counsel and on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

These consolidated appeals raise facial challenges to the validity of regulations adopted by respondent, New Jersey Department of Banking and Insurance, Division of Insurance (DOBI), pursuant to the Automobile Insurance Cost Reduction Act, *L.* 1998, *c.* 21 (AICRA). This court and our Supreme Court denied applications for a stay of the regulations pending this appeal. We accelerated the appeal because of the public interest. On April 14, 1999 the Third Circuit affirmed the United States District Court's decision to abstain from this controversy on *Burford* grounds. *Burford v. Sun Oil,* 319 *U.S.* 315, 87 *L.Ed.* 1424 (1943). *Chiropractic America v. Jaynee Lavecchia,* 180 *F.*3d 99 (3rd Cir.1999) (Judge Stapleton dissenting).

Appellants, New Jersey Coalition of Health Care Professionals, Inc., Physicians for Quality Care, Inc., Physicians Union of New Jersey, Local Lodge 8, and New Jersey Association of Osteopathic Physicians and Surgeons (Coalition); Association of Trial Lawyers of America—New Jersey (ATLA); and Chiropractic America, and Monmouth County, South Jersey, Northern Jersey and Cumberland County Chiropractic Societies (Chiropractic), appeal from adoption of *N.J.A.C.* 11:3–4 (Appendix A), the personal injury protection benefits medical protocols "care path" regulation. Amicus curiae, New Jersey State Bar Association (Bar), and amicus curiae, Brain Injury Association of New Jersey (BIANJ), also contest the validity of that regulation. We affirm respondent DOBI's adoption of *N.J.A.C.* 11:3–4.

Appellant, ATLA, also appeals from adoption of *N.J.A.C.* 11:3–3.4(c) (authorizing insurers to sell comprehensive and collision coverage as an option with the basic automobile insurance policy); *N.J.A.C.* 11:3–5.6(d)(3) (the so-called "loser-pays" provision permitting attorney-fee awards in favor of insurance carriers against

insureds in dispute resolution proceedings); *N.J.A.C.* 11:3–5.10(g) (making confidential the identity and background of those individuals performing medical-review services under the medical treatment and medical tests dispute-resolution process); and *N.J.A.C.* 11:3–5.6(c)(1) (mandating referral of a personal injury protection benefits dispute to a medical review organization on a random or rotating basis). Amicus curiae, BIANJ, also contends these regulations are invalid. We affirm respondent DOBI's adoption of these regulations, except for *N.J.A.C.* 11:3–5.6(d)(3), the "loser-pays" provision.

### OUTLINE

|  |  | Page |
|---|---|---|
| I. | *History of No–Fault Automobile Insurance.* | 215 |
| II. | *The Automobile Insurance Cost Reduction Act.* | 218 |
| III. | *The Regulations Adopted.* | 223 |
| IV. | *Challenge to N.J.A.C. 11:3–4* | 228 |
|  | A. *Intent of Legislature.* | 231 |
|  | B. *Foundation for and Validity of Care Paths* | 240 |
| V. | *Challenge to N.J.A.C. 11:3–3.4(c).* (collision and comprehensive coverages in basic policy) | 254 |
| VI. | *Challenge to N.J.A.C. 11:3–5.6(d)(3).* (loser-pays counsel fees provision) | 258 |
| VII. | *Challenge to N.J.A.C. 11:3–5.10(g).* (non-revelation of identity and background of medical reviewer) | 264 |
| VIII. | *Challenge to N.J.A.C. 11:3–5.6(c)(1).* (random referral of disputes to medical review organizations) | 267 |
| IX. | *Conclusion.* | 269 |

## I

Our original "no-fault" law, the New Jersey Automobile Reparation Reform Act (Act) was enacted by *L.* 1972, *c.* 70, on June 20, 1972, with the compulsory insurance for personal injury protection (PIP) coverage benefits mandatory on and after January 1, 1973. *N.J.S.A.* 39:6A–1 to –18. The primary reform under the Act was mandatory "personal injury protection coverage," consisting of medical-expense benefits, income continuation benefits, essential-services benefits, death benefits, and funeral expenses benefits, payable to an insured and members of the insured's family sustaining bodily injury or death as a result of an automobile acci-

dent, "without regard to negligence, liability or fault of any kind" of the insured and family members. *L.* 1972, *c.* 70, § 4; *N.J.S.A.* 39:6A–4. The 1972 Act encompassed the legislative recommendations of the Automobile Insurance Study Commission for (1) prompt and efficient provision of benefits for all automobile accident injury victims, (2) reduction or stabilization of the prices charged for automobile insurance, (3) ready availability of insurance coverage necessary to the provision of accident benefits, and (4) streamlining of the judicial procedures involved in third-party claims. Automobile Insurance Study Commission, *Reparation Reform for New Jersey Motorists* at 7 (December 1971); *Gambino v. Royal Globe Ins. Co.,* 86 *N.J.* 100, 105–06, 429 *A.*2d 1039 (1981).

"The adoption of that law was hailed as a major innovation in tort and insurance law that would end high automobile-insurance rates and congestion-causing numbers of personal-injury suits." *Roig v. Kelsey,* 135 *N.J.* 500, 502, 641 *A.*2d 248 (1994). The goal of the no-fault statutory scheme was "compensating a larger class of citizens than the traditional tort-based system and doing so with greater efficiency at a lower cost." *Emmer v. Merin,* 233 *N.J.Super.* 568, 572, 559 *A.*2d 845 (App.Div.), *certif. denied,* 118 *N.J.* 181, 570 *A.*2d 950 (1989) (citing Mario A. Iavicoli, *No Fault & Comparative Negligence in New Jersey* 20 (1973)). "Inherent in an effective no-fault system is either a limitation on or the elimination of conventional tort-based personal-injury lawsuits." *Oswin v. Shaw,* 129 *N.J.* 290, 295, 609 *A.*2d 415 (1992).

The tort limitations contained in the 1972 Act did not slow the rise in automobile insurance premiums and the Legislature continued to enact measures designed to stabilize or reduce insurance rates, enacting the "New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984," which introduced the concept of tort options and choice between two monetary thresholds for soft-tissue injuries. *L.* 1983, *c.* 362; *Oswin,* 129 *N.J.* at 296, 609 *A.*2d 415. However, the cost of automobile insurance continued to rise, with New Jersey's insurance premi-

ums among the highest in the Unites States. *Emmer*, 233 *N.J.Super.* at 573, 559 *A*.2d 845.

In 1988, the Legislature again struggled with the goal of achieving premium reductions while balancing the rights of persons injured in automobile accidents. *Oswin*, 129 *N.J.* at 296–97, 609 *A*.2d 415. Legislation was enacted and signed on September 8, 1988, effective January 1, 1989, *L*. 1988, *c*. 119, where,

> Persons buying automobile insurance now choose between two types of coverage regarding the right to seek recovery of noneconomic losses resulting from automobile-related injuries. The first, the 'verbal threshold,' allows recovery for noneconomic losses resulting only from those personal injuries that fit into one of the nine specified categories. .
>
> The alternative to the verbal-threshold option is the traditional tort option, which allows unrestricted recovery of noneconomic damages. The insured who elects that option pays a higher premium in return for the unlimited right to sue. An insured who makes no election is deemed to have chosen the verbal threshold.
>
> [*Oswin*, 129 *N.J.* at 297, 609 *A*.2d 415 (citations omitted).]

The 1988 changes also mandated a $250 medical deductible and a 20% copayment for medical expenses between $250 and $5,000. *Roig*, 135 *N.J.* at 507, 641 *A*.2d 248. "Thus, the Legislature guaranteed that in every automobile accident some medical expenses would not be paid by PIP." *Ibid.* "For those below-deductibles and copayments, the insured was responsible, either through the insured's other insurance coverage, or, if the insured had no other insurance, . . . out of the insured's own pocket." *Id.* at 509, 641 *A*.2d 248.

The "Fair Automobile Insurance Reform Act of 1990," *L*. 1990, *c*. 8, was approved on March 12, 1990, in yet another attempt to achieve premium reduction and economy in the no-fault system. *Id.* at 509–10, 641 *A*.2d 248. The Legislature found increasingly obvious to all that the common purpose of "economy" of the no-fault law had not been attained. *L*. 1990, *c*. 8, § 2d. Among the reforms enacted through this legislation were placement of a cap of $250,000 per person per accident on payment of reasonable medical expenses, *L*. 1990, *c*. 8, § 4; an option to make the insured's health insurance the primary source for payment of medical and hospital expenses, *L*. 1990, *c*. 8, § 2; and a rewriting

of the medical fee schedules provisions contained in *N.J.S.A.* 39:6A–4.6 to "incorporate the reasonable and prevailing fees of 75% of the practitioners" within a region and providing that "[n]o health care provider may demand or request any payment from any person in excess of those permitted by the medical fee schedules established pursuant to this section...." *L.* 1990, *c.* 8, § 7.

From the inception of this no-fault statutory scheme, the Legislature intended to eliminate minor personal-injury-automobile-negligence cases from the court system in order to achieve economy and provide lower insurance premiums to the public. *Roig*, 135 *N.J.* at 510, 641 *A.2d* 248.

## II

The Automobile Insurance Cost Reduction Act (AICRA), *L.* 1998, *c.* 21, the authority for the regulations under challenge here, was signed into law on May 19, 1998, and made further comprehensive changes in the no-fault automobile insurance laws of this State. When enacting chapter 21, the Legislature expressed these findings and declarations, repeated here in full because of their particular relevance to the purpose of this remedial legislation:

b. The Legislature finds and declares:

Whereas, While New Jersey's automobile insurance no-fault law, enacted twenty-six years ago, has provided valuable benefits in the form of medical benefits and wage replacement benefits, without regard to fault, to New Jersey residents who have been injured in an automobile accident; and

Whereas, Medical benefits paid by no-fault policies over those years amount to billions of dollars, which would otherwise have been paid by health insurance, thus raising the cost of health insurance for everyone; and

Whereas, While medical benefits under no-fault insurance were unlimited under the law enacted in 1972, the rapidly escalating cost of those benefits made it necessary for the Legislature to reduce those benefits to a limit of $250,000 in 1990; and

Whereas, Since the enactment of the verbal threshold in 1988, the substantial increase in the cost of medical expense benefits indicates that the benefits are being overutilized for the purpose of gaining standing to sue for pain and suffering, thus undermining the limitations imposed by the threshold and necessitating the

imposition of further controls on the use of those benefits, including the establishment of a basis for determining whether treatments or diagnostic tests are medically necessary; and

Whereas, The present arbitration system has not sufficiently addressed the Legislature's goal of eliminating payment for treatments and diagnostic tests which are not medically necessary, leading to the belief that a revised dispute resolution mechanism needs to be established which will accomplish this goal; and

Whereas, The principle underlying the philosophical basis of the no-fault system is that of a trade-off of one benefit for another; in this case, providing medical benefits in return for a limitation on the right to sue for non-serious injuries; and

Whereas, While the Legislature believes that it is good public policy to provide medical benefits on a first party basis, without regard to fault, to persons injured in automobile accidents, it recognizes that in order to keep premium costs down, the cost of the benefit must be offset by a reduction in the cost of other coverages, most notably a restriction on the right of persons who have non-permanent or non-serious injuries to sue for pain and suffering; and

Whereas, The high cost of automobile insurance in New Jersey has presented a significant problem for many lower income residents of the state, many of whom have been forced to drop or lapse their coverage in violation of the State's mandatory motor vehicle insurance laws, making it necessary to provide a lower-cost option to protect people by providing coverage to pay their medical expenses if they are injured; and

Whereas, To meet these goals, this legislation provides for the creation of two insurance coverage options, a basic policy and a standard policy, provides for cost containment of medical expense benefits through a revised dispute resolution proceeding, provides for a revised lawsuit threshold for suits for pain and suffering which will eliminate suits for injuries which are not serious or permanent, including those for soft tissue injuries, would more precisely define the benefits available under the medical expense benefits coverage, and establishes standard treatment and diagnostic procedures against which the medical necessity of treatments reimbursable under medical expense benefits coverage would be judged; and

Whereas, It is generally recognized that fraud, whether in the form of inappropriate medical treatments, inflated claims, staged accidents, falsification of records, or in any other form, has increased premiums, and must be uncovered and vigorously prosecuted, and while the pursuit of those who defraud the automobile insurance system has heretofore been addressed by the State through various agencies, it has been without sufficient coordination to aggressively combat fraud, leading to the conclusion that greater consolidation of agencies which were created to combat fraud is necessary to accomplish this purpose; and

Whereas, With these many objectives, the Legislature nevertheless recognizes that to provide a healthy and competitive automobile insurance market, insurers are entitled to earn an adequate rate of return through the ratemaking process, which shall reflect the impact of the cost-saving provisions of this act and other recent legislative insurance reforms; and

Whereas, The Legislature has thus addressed these and other issues in this comprehensive legislation designed to preserve the no-fault system, while at the same time reducing unnecessary costs which drive premiums higher.

[*N.J.S.A.* 39:6A–1.1.]

AICRA provides for significant changes in the definitions of reimbursable "medical expenses" and "hospital expenses," defines the statutory phrase "medically necessary," and vests significant regulatory authority with the Commissioner of Banking and Insurance. We stress that AICRA controls reimbursable medical expenses only. It does not directly control or regulate medical practice *per se* but regulates the insurance compensation mechanism. The secondary effect, of course, is to control treatment.

Some comparisons with the no-fault law prior to the enactment of AICRA illustrate the breadth of these changes. The term "medical expenses" was previously defined by *N.J.S.A.* 39:6A–2(e), as follows:

e. 'Medical expenses' means expenses for medical treatment, surgical treatment, dental treatment, professional nursing services, hospital expenses, rehabilitation services, X-ray and other diagnostic services, prosthetic devices, ambulance services, medication and other reasonable and necessary expenses resulting from the treatment prescribed by persons licensed to practice medicine and surgery, ... dentistry, ... psychology, ... or chiropractic ... or by persons similarly licensed in other states or nations or any nonmedical treatment rendered in accordance with a recognized religious method of healing.

[*L.* 1972, *c.* 70 § 2.]

AICRA modifies the definition of "medical expenses," to read as follows:

e. 'Medical expenses' means *reasonable and necessary expenses for treatment or services as provided by the policy,* including medical, surgical, rehabilitative and diagnostic services and hospital expenses, provided by a health care provider licensed or certified by the State or by another state or nation, and reasonable and necessary expenses for ambulance services or other transportation, medication and other services as may be provided for, and *subject to such limitations as provided for, in the policy, as approved by the commissioner.* 'Medical expenses' shall also include any nonmedical remedial treatment rendered in accordance with a recognized religious method of healing.

[*L.* 1998, *c.* 21, § 2 (emphasis supplied); *N.J.S.A.* 39:6A–2(e).]

A definition of "medically necessary" was added in AICRA, providing:

m. 'Medically necessary' means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury (1) is not primarily for the convenience of the injured person or provider, (2) is the most appropriate standard or level of service which is *in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization,* and (3) does not involve unnecessary diagnostic testing.

[*L.* 1998, *c.* 21 § 2 (emphasis supplied); *N.J.S.A.* 39:6A–2(m).]

Section 2(*o*) of AICRA, codified as *N.J.S.A.* 39:6A–3.1, amended the no-fault law to permit an insured to elect a "basic automobile insurance policy," as an alternative to the mandatory liability and personal injury protection (PIP) benefits coverages provided in *N.J.S.A.* 39:6A–3 and 39:6A–4. This basic automobile insurance policy limits PIP coverage to payment for medical expense benefits "as provided in the policy and approved by the commissioner" for the "reasonable and necessary treatment for bodily injury" in an amount not to exceed $15,000 per person per accident, except that medical expense benefits shall be paid in an amount not to exceed $250,000 "for all medically necessary treatment of permanent or significant brain injury, spinal cord injury or disfigurement or for medically necessary treatment of other permanent or significant injuries rendered at a trauma center or acute care hospital immediately following the accident and until the patient is stable, no longer requires critical care and can be safely discharged or transferred to another facility in the judgment of the attending physician." *L.* 1998, *c.* 21 § 4; *N.J.S.A.* 39:6A–3.1(a). This section further provides:

Benefits provided under basic coverage shall be in accordance with a *benefit plan provided in the policy and approved by the commissioner. The policy form, which shall be subject to the approval of the commissioner,* shall set forth the benefits provided under the policy, including eligible medical treatments, diagnostic tests and services as well as such other benefits as the policy may provide. *The commissioner shall set forth by regulation a statement of the basic benefits which shall be included in the policy.* Medical treatments, diagnostic tests, and services provided by the policy shall be rendered in accordance with commonly accepted protocols and professional standards and practices which are commonly accepted as being beneficial for the treatment of the covered injury. *Protocols and profession-*

*al standards and practices* which are deemed to be commonly accepted pursuant to this section shall be those recognized by national standard setting organizations, national or state professional organizations of the same discipline as the treating provider, or those designated or *approved by the commissioner in consultation with the professional licensing boards in the Division of Consumer Affairs in the Department of Law and Public Safety. The commissioner, in consultation with the Commissioner of the Department of Health and Senior Services and the applicable licensing boards, may reject the use of protocols, standards and practices or lists of diagnostic tests set by any organization deemed not to have standing or general recognition by the provider community or the applicable licensing boards. Protocols shall be deemed to establish guidelines as to standard appropriate treatment and diagnostic tests for injuries sustained in a automobile accident,* but the establishment of standard treatment protocols or protocols for the administration of diagnostic tests shall not be interpreted in such a manner as to preclude variance from the standard when warranted by reason of medical necessity. . *The policy form may provide for the precertification of certain procedures, treatments, diagnostic tests, or other services or for the purchase of durable medical goods, as approved by the commissioner,* provided that the requirement for precertification shall not be unreasonable, and no precertification requirement shall apply within ten days of the insured event. The policy may provide that *certain benefits* provided by the policy which are in excess of the basic benefits required by the commissioner to be included in the policy *may be subject to reasonable copayments* in addition to the copayments provided for herein, provided that the copayments shall not be unreasonable and shall be established in such a manner as not to serve to encourage underutilization of benefits subject to the copayments, nor encourage overutilization of benefits.

[*L.* 1998, *c.* 21 § 4; *N.J.S.A.* 39:6A–3.1(a) (emphasis supplied).]

Similar standards and regulatory requirements are contained in AICRA's amendments to the mandatory PIP coverages contained in *N.J.S.A* 39:6A–4. Thus the benefit plan provided in the policy must be "approved by the Commissioner" and "eligible medical treatments, diagnostic tests and other services" must be rendered in accordance with "commonly accepted protocols and professional standards and practices" which are "approved by the Commissioner in consultation with the professional licensing boards in the Division of Consumer Affairs in the Department of Law and Public Safety." *L.* 1998, *c.* 21 § 6; *N.J.S.A.* 39:6A–4(a). This section further provides:

Protocols shall be deemed to establish guidelines as to standard appropriate treatment and diagnostic tests for injuries sustained in automobile accidents, but the establishment of standard treatment protocols or protocols for the administration of diagnostic tests shall not be interpreted in such a manner as to preclude variance from the standard when warranted by reason of medical necessity.

*The commissioner may enlist the services of a benefit consultant in establishing the basic benefits level provided in this subsection, which shall be set forth by regulation no later than 120 days following the enactment date of L. 1998, c. 21.*

[*L.* 1998, *c.* 21 § 6; *N.J.S.A.* 39:6A–4(a) (emphasis supplied).]

This section also provides for "the precertification of certain procedures, treatments, diagnostic tests, or other services, ... as approved by the commissioner" which "shall not be unreasonable" and are inapplicable "within ten days of the insured event." *L.* 1998, *c.* 21 § 4. *See also N.J.A.C.* 11:3–4.8. Precertification procedures are no longer an issue on this appeal. In a bulletin of May 3, 1999 the Commissioner has withdrawn her earlier approval of certain precertification procedures; she will reconsider these procedures before issuing new directives or regulations on precertification of treatment or tests. (Bulletin No. 99–07).

## III

We first consider the background of the challenge to the carepath regulations, *N.J.A.C.* 11:3–4. Consistent with AICRA's mandate, the Commissioner adopted *N.J.A.C.* 11:3–4, entitled "Personal Injury Protection Benefits; Medical Protocols; Diagnostic Tests." 30 *N.J.R.* 4401. (Appendix A contains the challenged regulations in full.) The regulations purported to maintain quality of care while at the same time discouraging medically unnecessary treatments and diagnostic tests for certain injuries to the neck and back. The regulations set out protocols through the development of care paths which apply only to certain injuries of the neck and back — injuries which DOBI thought were fraught with potential for unnecessary treatment and overutilization of benefits. The care paths use a flow-chart method which presents a diagrammatic view of expected treatment patterns based on patient symptoms and objective evaluations by practitioners. (See Appendix A.) The care paths also contain projected utilization norms for assessing intensity and length of treatment. Insurers had to comply with at least the minimum requirements of AICRA and the Department's regulations. 30 *N.J.R.* 3213.

In carrying out its mandate, the Department enlisted the services of Price Waterhouse Coopers (PWC), a health-benefits consultant, which conducted a literature search of standards set by national organizations. An *ad hoc* committee consisting of representatives of the professional-licensing boards also provided the Department with relevant articles from medical journals and other medical sources relating to the treatment of injuries to the neck and back. This part of the consultative process, along with comments received by the Department of Health and Senior Services took place prior to the publication of the rule proposal on September 8, 1998. 30 *N.J.R.* 3211. AICRA allowed 180 days for rule adoption and implementation. (§ 74, codified as *N.J.S.A.* 39:6A–1.1 Note.) Additional consultation took place prior to the adoption of the regulations and continued throughout the implementation period of the new regulations.

The new care-path regulations established typical courses of treatment for certain common automobile-related injuries and served as standards for measuring medical necessity. They did not prescribe a course of conduct for a particular patient. 30 *N.J.R.* 4403. The regulations recognized that an individual's medical condition and other circumstances, such as pre-existing conditions, may justify deviation from the expected course of treatment. 30 *N.J.R.* 4403. The regulations were not intended to affect the scope of practice of any licensed provider, including licensed chiropractors, 30 *N.J.R.* 4407, nor restrict the ability of individuals to select the provider of their choice. 30 *N.J.R.* 4403.

The regulations expressly stated they established only guidelines against which to measure and identify unnecessary or inappropriate treatment. Each page of the care paths specifically provides:

NOTE: These Care Paths identify typical courses of intervention. There may be patients who require more or less treatment. However, cases that deviate from the Care Paths may be subject to more careful scrutiny and may require documentation of the special circumstances. Treatments must be based upon patient need and professional judgment. Deviations may be justified by individual circumstances, such as pre-existing conditions and/or co-morbidities . . .

[30 *N.J.R.* 4413.]

*N.J.A.C.* 11:3–4 establishes standard medical protocols, lists of certain acceptable and unacceptable diagnostic tests, and general standards governing decision point review. Specifically, *N.J.A.C.* 11:3–4.6 establishes medical protocols by reference to six care paths which establish standard courses of appropriate treatment, including the administration of diagnostic tests, for identified injuries stemming from trauma to the neck and back. The care paths are not applicable to generally more serious injuries such as dismemberment, scarring, fractures, or head and organ injury. As noted, these care paths apply only to generally less serious-injuries — soft tissue injuries — which, in DOBI's view, have driven up PIP and liability premium costs.

At certain points during the period of treatment, the care paths designate hexagonal "decision points" which reference a second opinion, development of a treatment plan, or case management. *N.J.A.C.* 11:3–4.6(b). Decision point review provides for communication between the provider and the insurer about individual medical conditions. Failure to comply with the decision point procedures may result in additional copayments which insurers have the option to impose. *N.J.A.C.* 11:3–4.7(b)(3). These notice and copayment provisions include a similar penalty for failure to comply with the 21–day notice requirement enacted pursuant to *N.J.S.A.* 39:6A–5(a), which requires providers to furnish insurers with notice of commencement of treatment within 21 days or risk denial of payment. They are also comparable to rules concerning the copayment found in most health insurance policies with pre-certification programs. *See N.J.A.C.* 11:4–42.8; 30 *N.J.R.* 3212; 30 *N.J.R.* 4409.

Notification to the insurer during the decision point review does not require an affirmative response by the insurer in order for the provider to continue providing treatment. Rather, the decision point review requires notice of a proposed course of treatment in order to provide the insurer with the opportunity to confirm that treatment is medically necessary. 30 *N.J.R.* 4409. Failure by the

insurer to affirmatively deny treatment based on certain established procedures indicates that the treatment may continue. The standards governing insurers' decision point review plans are established at *N.J.A.C.* 11:3–4.7.

*N.J.A.C.* 11:3–4.5(a) governs the reimbursement of diagnostic tests. The tests listed in this portion of the regulation were identified by a working committee comprised of representatives of the professional licensing boards in the Division of Consumer Affairs in the Department of Law and Public Safety (professional boards). 30 *N.J.R.* 3211. *N.J.A.C.* 11:3–4.5(a) enumerates certain diagnostic tests, *e.g.,* spinal diagnostic ultrasound, reflexology, and surface EMG, which are not reimbursable under PIP medical expense coverage because they fail to yield data of sufficient value in the development, evaluation and implementation of an appropriate plan for the treatment of motor vehicle accident injuries. *N.J.A.C.* 11:3–4.5(b) enumerates other diagnostic tests, *e.g.,* needle EMG, MRI, and CAT Scan, which will be reimbursable when medically necessary and consistent with clinically supported findings, subject to various restrictions relating to each test. Administration of these tests are subject to decision point review pursuant to *N.J.A.C.* 11:3–4.7 and *N.J.A.C.* 11:3–4.5(d). Neither the standards proposed in *N.J.A.C.* 11:3–4.5(b), nor the decision point review required for administration of these tests applies to any diagnostic tests administered during emergency care. *N.J.A.C.* 11:3–4.5(e).

The regulations expressly provide that the standards relevant to determining the appropriate use of diagnostic tests listed in *N.J.A.C.* 11:3–4.5(b) are not intended to replace the good-faith judgment of trained medical professionals. *N.J.A.C.* 11:3–4.5(c). The regulations indicate that the standards established are intended as flexible, not rigid. *Id.* Any other medical diagnostic tests not referenced in the rule can be administered in accordance with the defined standard of medical necessity. *See* 30 *N.J.R.* 3211.

As required by AICRA, each of the professional licensing boards governing health care also promulgated complementary

regulations, in accordance with the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15, which list valid diagnostic tests for treating individuals involved in accidents, to be used in conjunction with the health-care protocols promulgated by the Department. *L.* 1998, *c.* 21, § 12, codified at *N.J.S.A.* 39:6A–4.7. The State Board of Dentistry, the State Board of Medical Examiners and the State Board of Physical Therapy proposed rules listing valid diagnostic tests on October 19, 1998. *See* 30 *N.J.R.* 3748a, 3751a, and 3755a, respectively. The State Board of Chiropractic Examiners proposed its rules on November 2, 1998. *See* 30 *N.J.R.* 3925a. Following the public comment period each of the boards adopted and published their rules.

On December 2, 1998 the State Board of Dentistry adopted new rules, codified at *N.J.A.C.* 13:30–8.22 establishing diagnostic tests relating to traumatically-induced temporomandibular dysfunction (TMJ). The State Board of Medical Examiners adopted new rules codified at *N.J.A.C.* 13:35–2.6 on December 9, 1998 which govern the validity of diagnostic tests intended to establish medical diagnoses for the purpose of recommending an appropriate course of treatment. On November 24, 1998 the State Board of Physical Therapy adopted amendments to rules, *N.J.A.C.* 13:39A–2.1 and 2.2, governing the performance of physical therapy evaluations through diagnostic testing, which will assist treatment for a patient consistent with the statutes governing physical therapists. *See* 31 *N.J.R.* 661. The State Board of Chiropractic Examiners adopted new rules, *N.J.A.C.* 13:44E–3 and adopted amendments to rules at *N.J.A.C.* 13:44E–1.1 and 2.5 on December 3, 1998. The rules establish standards relating to the validity of certain diagnostic tests, and establish special requirements for electrodiagnostic testing and other special examinations.

The overall 15–percent premium cost reductions (25–percent for PIP coverage) by AICRA were ordered to take effect within 90 days of the later of either the Commissioner's adoption of the PIP medical expense basic benefits regulation or the professional boards' adoption of the lists of valid diagnostic tests. *See L.* 1998,

c. 21, § 67, as amended by *L.* 1999, *c.* 52, codified at *N.J.S.A.* 17:29A–51 (reaffirming the Commissioner's authority to order an overall 15–percent reduction in rates), and *L.* 1998, *c.* 21, § 74, codified at *N.J.S.A.* 39:6A–1.1 Historical and Statutory Notes. Thus, *N.J.A.C.* 11:3–4, other reforms and implementing regulations, and the overall 15–percent premium cost reductions generally took effect on March 22, 1999.

## IV

■ Appellants contend that the Commissioner exceeded her statutorily-delegated authority in adopting the care-path regulations. The Commissioner retorts that the prime consideration in implementing AICRA's reforms, in addition to cost-reduction, was to provide consumers with reasonable medical benefits while minimizing the possibility that actual or alleged accident victims will receive unnecessary or fraudulent medical treatment and testing. The Commissioner urges that medical treatment and diagnostic tests should be rendered judiciously and in accordance with medical necessity rather than wastefully and unnecessarily. The Commissioner asserts she was guided by these principles in this situation. Efficacious controls on providers were needed and AICRA and the new regulations are the appropriate tools.

■ Where a legislative body establishes basic policy in its enabling statute, it may grant broad authority to an administrative agency to make rules and regulations to effectuate those policies. *New Jersey State League of Municipalities v. Department of Community Affairs,* 158 *N.J.* 211, 222–23, 729 *A.*2d 21 (1999); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 560–63, 384 *A.*2d 795 (1978). This broad delegation of authority recognizes that the "basic purpose of establishing agencies to consider and promulgate rules is to delegate the primary authority of implementing policy in a specialized area to governmental bodies with the staff, resources, and expertise to understand and solve those specialized problems." *Bergen Pines .Hospital v. Department of Human Services,* 96 *N.J.* 456, 474, 476 *A.*2d 784

(1984); *see In re Amendment of N.J.A.C. 8:31B–3.31,* 119 *N.J.* 531, 543, 575 *A.*2d 481 (1990).

The actions of an administrative agency are presumed to be valid and reasonable if they are within the authority delegated to the agency. *Bergen Pines,* 96 *N.J.* at 477, 476 *A.*2d 784. The burden is on the party challenging the agency action to overcome these presumptions. *Medical Society of New Jersey v. Division of Consumer Affairs,* 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990). "[T]he grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities." *New Jersey Guild of Hearing Aid Dispensers,* 75 *N.J.* at 562, 384 *A.*2d 795. A finding that an agency acted in an *ultra vires* fashion in adopting regulations is generally disfavored. *Id.* at 561, 384 *A.*2d 795; *A.A. Mastrangelo, Inc. v. Department of Environmental Protec.,* 90 *N.J.* 666, 683, 449 *A.*2d 516 (1982). Particularly, in the field of insurance, the expertise and judgment of the Commissioner may be given great weight. *Matter of Aetna Cas. and Sur. Co.,* 248 *N.J.Super.* 367, 376, 591 *A.*2d 631, *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991), *cert. denied sub nom. Allstate v. Fortunato,* 502 *U.S.* 1121, 112 *S.Ct.* 1244, 117 *L.Ed.*2d 476 (1992).

Justice Stein recently commented on the standard of review in facial challenges to administrative regulations:

That deference, however, is not without limit. A regulation "must be within the fair contemplation of the delegation of the enabling statute." *New Jersey Guild of Hearing Aid Dispensers,* 75 *N.J.* at 561–62, 384 *A.*2d 795 (quoting *Southern Jersey Airways, Inc. v. National Bank of Secaucus,* 108 *N.J.Super.* 369, 383, 261 *A.*2d 399 (App.Div.1970)); *see also In re Township of Warren,* 132 *N.J.* at 26, 622 *A.*2d 1257 ("Courts ... act only in those rare circumstances when it is clear that the agency action is inconsistent with the legislative mandate.") (quoting *Williams v. Department of Human Servs.,* 116 *N.J.* 102, 108, 561 *A.*2d 244 (1989)).

This Court has recognized that "the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and ... courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." *New Jersey Guild of Hearing Aid Dispensers,* 75 *N.J.* at 562, 384 *A.*2d 795; *see also Cammarata v. Essex County Park Com'n,* 26 *N.J.* 404, 411, 140 *A.*2d 397 (1958) ("The grant of an express power is always attended by the incidental authority

fairly and reasonably necessary or appropriate to make it effective."). "[T]he absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation." *A.A. Mastrangelo, Inc. v. Commissioner, Dep't of Envtl. Protection,* 90 *N.J.* 666, 683–84, 449 *A.*2d 516 (1982). [*New Jersey State League of Municipalities v. Department of Community Affairs,* 158 *N.J.* at 222–23, 729 *A.*2d 21 (1999).]

Appellants claim that the medical protocol regulations contravene legislative intent. We find to the contrary. Most, if not all, of the arguments against the protocols were presented to and considered by the Legislature at the several regulatory oversight hearings in 1998 and 1999 on the Department's regulatory proposals and on the regulations adopted. The Legislature has taken no formal action to override the regulations, as it could have done, although certain individual legislators have expressed dissatisfaction with the regulations. *N.J. Const.* (1947), Art. V, § 4, para. 6;[1] *Matter of Adoption of Regulations Governing State Health Plan,* 135 *N.J.* 24, 28, 637 *A.*2d 1246 (1994).

---

[1] *N.J. Const.* (1947), Art. V., § 4, para. 6 states:

6. Rules and regulations; filing; publication; legislative review

6. No rule or regulation made by any department, officer, agency or authority of this State, except such as relates to the organization or internal management of the State government or a part thereof, shall take effect until it is filed either with the Secretary of State or in such other manner as may be provided by law. The Legislature shall provide for the prompt publication of such rules and regulations. The Legislature may review any rule or regulation to determine if the rule or regulation is consistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement. Upon a finding that an existing or proposed rule or regulation is not consistent with legislative intent, the Legislature shall transmit this finding in the form of a concurrent resolution to the Governor and the head of the Executive Branch agency which promulgated, or plans to promulgate, the rule or regulation. The agency shall have 30 days to amend or withdraw the existing or proposed rule or regulation. If the agency does not amend or withdraw the existing or proposed rule or regulation, the Legislature may invalidate that rule or regulation, in whole or in part, or may prohibit that proposed rule or regulation, in whole or in part, from taking effect by a vote of a majority of the authorized membership of each House in favor of a concurrent resolution providing for invalidation or prohibition, as the case may be, of the rule

██ Against this background, our review of these regulations is limited to three inquiries:

> (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its actions; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [*Matter of Warren*, 117 *N.J.* 295, 296–97, 566 *A.2d* 534 (1989) (citation omitted).]

Given this highly deferential standard of review, we are not convinced that the regulation is beyond the statutory authority granted to DOBI or inconsistent with legislative intent. The presumption of validity and reasonableness accorded by law to the regulations is not overcome. "[I]n our increasingly complex society, replete with ever-changing and more technical problems," the Legislature "simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 *U.S.* 361, 372, 109 *S.Ct.* 647, 102 *L.Ed.2d* 714, 731 (1989) (Blackmun, J., on the federal sentencing guidelines). Here, the legislature delegated the duty to create a scheme of reasonable and necessary treatment for certain automobile accident-related injuries with the goal of cost accountability and containment — a rigorous assignment. We cannot say that the regulatory result is so misconceived as to be illegal, arbitrary, or capricious.

## IV–A

As noted, Sections 4 and 6 of AICRA direct the Commissioner to establish by regulation the basic benefits to be provided in insurance policies and to designate standard protocols for medical treatment and diagnostic testing. As authorized by AICRA, *N.J.S.A.* 39:6A–3.4 and –1, the Department secured the assistance

---

or regulation. This vote shall not take place until at least 20 calendar days after the placing on the desks of the members of each House of the Legislature in open meeting of the transcript of a public hearing held by either House on the invalidation or prohibition of the rule or regulation. Amended general election November 3, 1992.

of PWC, the benefits consultant, and an *ad hoc* committee of the professional boards, in developing the regulations.

Consistent with AICRA's mandate to establish a standard against which the medical necessity of treatments and diagnostic tests can be measured, the Commissioner adopted *N.J.A.C.* 11:3–4, entitled "Personal Injury Protection Benefits; Medical Protocols; Diagnostic Tests." 30 *N.J.R.* 4401. These rules, covering only injuries to the neck and back, were designed to maintain quality and choice of medical care, while at the same time to discourage medically-unnecessary treatments and diagnostic tests. There are two separate but virtually identical provisions in AICRA which govern the manner in which medical expense benefits are to be established in both the basic policy and in the standard policy. *See L.* 1998, *c.* 21 §§ 4 and 6, codified at *N.J.S.A.* 39:6A–3.1 and–4, respectively. The Commissioner established the same standard for both policies to avoid a double standard of care based on policy limits. Insurers are required to comply with at least the minimum requirements established in AICRA, as further refined in the Department's rules. 30 *N.J.R.* 3213. Thus, although AICRA contemplates that insurers can define basic medical expense benefits within their policy forms, the Department's regulations establish the boundaries which define minimum acceptable standards for reimbursement.

The new regulations establish typical courses of treatment for certain common automobile-related injuries to the neck and back only. They establish standard medical protocols, lists of certain acceptable and unacceptable diagnostic tests, and general standards governing "decision point" reviews. As noted, the Commissioner withdrew the standards governing precertification plans on May 3, 1999 and soon will revisit this aspect.

*N.J.A.C.* 11:3–4.6 establishes medical protocols by reference to six care paths which establish standard courses of appropriate treatment, including the administration of diagnostic tests, for identified injuries stemming from trauma to the neck and back. (See Appendix A.) Care Path 1 establishes guidelines for the

treatment and diagnostic testing of cervical spine soft tissue injuries. Care Path 2 governs cervical spine "herniated disc/radiculopathy." Care Path 3 governs thoracic spine soft tissue injuries. Care Path 4 governs thoracic spine "herniated disc/radiculopathy." Care Path 5 governs lumbar-sacral spine soft tissue injuries. And, Care Path 6 governs lumbar-sacral spine "herniated disc/radiculopathy." *N.J.A.C.* 11:3–4.6(d). The care paths apply only to non-emergency treatments, *see N.J.A.C.* 11:3–4.6, and use a flow-chart method which presents a diagrammatic view of expected treatment patterns and projected utilization norms for assessing intensity and length of treatment.

The standards established in *N.J.A.C.* 11:3–4 do not prescribe a rigid, inflexible course of conduct for a particular patient. 30 *N.J.R.* 4403, 4413. They explicitly recognize an individual's medical condition and other circumstances, such as pre-existing conditions, may justify deviation from an expected course of treatment. 30 *N.J.R.* 4403, 4413. The fact the regulations establish guidelines against which to measure and identify unnecessary or inappropriate treatment is expressly stated. The regulations are not intended as a straight-jacket. Each page of the care paths provides:

Note: These Care Paths identify typical courses of intervention. There may be patients who require more or less treatment. However, cases that deviate from the Care Paths may be subject to more careful scrutiny and may require documentation of the special circumstances. Treatments must be based upon patient need and professional judgment. Deviations may be justified by individual circumstances, such as pre-existing conditions and/or co-morbidities....

[30 *N.J.R.* 4413].

Treatments may vary from the standards set out in the care paths for reasons of medical necessity where there is objective clinical support for a deviation.

At certain critical intervals during the period of treatment, the care paths designate "decision point" review. *N.J.A.C.* 11:3–4.7. These decision points identify, in light of expected treatment patterns, occasions at which the patient's treatment should be reevaluated or the time when certain diagnostic tests may be appropriate. At these intervals, where continued treatment is possibly necessary, a second opinion may be appropriate to devel-

op a treatment plan or to refer the patient to case management. *N.J.A.C.* 11:3–4.6(b).

At the decision point, the treating physician must advise the insurer of the patient's progress and need, if any, for continued treatment. This notification does not require treatment to stop. The treating provider does not need an affirmative response from the insurer in order to continue treatment. 30 *N.J.R.* 4409. The decision point review requires notice to the insurer of the proposed continuation of treatment in order to provide the insurer with information regarding the medical necessity of continued treatment. *N.J.A.C.* 11:3–4.7(b)(1). The insurer must notify the injured person within three days of the insurer's medical examination whether further treatment is authorized or denied. *N.J.A.C.* 11:3–4.7(b)(2)(vi). If denied, payment stops at the decision point.

The regulation also prescribes standards for the administration of diagnostic tests. *N.J.A.C.* 11:3–4.5(a) enumerates certain diagnostic tests which will not be reimbursable under PIP because they do not yield data of sufficient value in the development, evaluation and implementation of an appropriate treatment for motor vehicle injuries. *N.J.A.C.* 11:3–4.5(b) lists other diagnostic tests which are reimbursable when administered during emergency care, or are otherwise medically necessary and clinically supported, based on the judgment of the treating provider. Administration of these tests is subject to decision point review, unless used during emergency care. See *N.J.A.C.* 11:3–4.5(e); *N.J.A.C.* 11:3–4.7(e). All other diagnostic tests not mentioned in the rule may be administered in accordance with the defined standard of medical necessity. 30 *N.J.R.* 3211. The regulation expressly states that the provisions for these diagnostic tests are intended to be flexible, not rigid. *N.J.A.C.* 11:3–4.5(c).

Because the Legislature has recognized and insurers have agreed that an important element in cost-containment involves notice to the insurer of both the commencement of and periodic notice of continuation of treatment, *N.J.A.C.* 11:3–4.7(b)(3) allows insurers to impose a penalty for failure to adhere to procedural

notice requirements of up to 50–percent of the amount claimed. This co-payment penalty encourages patients and providers to comply with decision point and other notice requirements. The regulation establishes a ceiling for the amount of penalty an insurer can choose to impose. Thus, the insurer cannot simply ignore the claim upon a procedural default by the insured.

The notice and copayment provisions of *N.J.A.C.* 11:3–4.7(b)(3) are similar to the 21–day notice requirement contained in *N.J.S.A.* 39:6A–5(a), which requires providers to furnish insurers with notice of commencement of treatment within 21 days or risk denial of payment. These provisions are comparable to copayment provisions found in most health insurance policies with precertification programs. *See N.J.A.C.* 11:4–42.8(a)(3); *see also N.J.A.C.* 11:20, Appendix Exhibit D (standard IHC form); and *N.J.A.C.* 11:21 (standard SEH form).

The decision point. review system devised by DOBI is not perfect. Appellants properly fear that delays caused by the decision point review mechanism could result in interrupted treatment or justified treatment left uncompensated by PIP benefits. This is perhaps possible but the Legislature and the Executive need not design a perfect solution to social and economic problems to pass judicial muster. The regulatory solution must be reasonable, not foolproof. The regulations consistently provide that decision point review "shall avoid undue interruptions in a course of treatment." *N.J.A.C.* 11:3–4.7(b)(4); *N.J.A.C.* 11:3–4.8(h).

To ensure that implementation of *N.J.A.C.* 11:3–4 is consistent with the intended purpose, the Commissioner upon the adoption of the regulations stated that she would closely monitor the effect and execution of these standards. The Commissioner has appointed an advisory committee, the Personal Injury Protection Technical Advisory Committee (PIPTAC), which will monitor proper implementation and application of the regulations. The Committee, composed of a variety of members, including representatives of the professional boards, will assist the Commissioner in determining whether the standards established in the regulations per-

mit injured individuals to receive necessary medical care and to insure that reimbursement for medical care is not arbitrarily denied. (Order A99–109 of May 10, 1999.) We take the Commissioner's word that this potential problem will be carefully monitored. We may presume the Commissioner will "implement the regulations in a realistic and timely manner consistent with [her] statutory duty." *State Farm v. State*, 124 *N.J.* 32, 63, 590 *A.*2d 191 (1991).

These regulations are consistent with the legislative policies announced in AICRA. This is evident from the Sponsor's Statements in both the Senate and Assembly versions of the bills which were signed into law by Governor Whitman. The statements to Senate Bill No. 3 and Assembly Bill No.1970, provide:

> In order to reduce the overutilization of medical benefits under automobile insurance policies, which is the principal cause of the escalation in premiums in recent years, the bill establishes the standard that providers are expected to use commonly accepted protocols in treating patients injured in automobile accidents; while the bill does not impose a rigid adherence to treatment protocols, the protocols establish a baseline for determining whether unnecessary treatment is taking place. Similarly, to better define standards for diagnostic testing, the bill requires the professional boards in the Division of Consumer Affairs to establish a list of diagnostic tests generally determined to be acceptable for treatment in the respective professions. This is intended to eliminate the problem of the use of diagnostic tests which are not generally recognized as useful or appropriate. In order to reduce the number of disputes regarding medical treatment, the bill provides for more specificity in the policy form itself, so that it would be more similar to a health insurance policy.
>
> [*S.* 3, 208th Leg., 1st Sess. (1998); *A.* 1970, 208th Leg., 1st Sess. (1998).]

Consistent with these statements, the regulations provide a baseline or standard against which to measure the medical necessity of treatments without adhering to rigid mandates.

Appellants also claim that the regulations function to create a PIP system of undesirable and unauthorized "managed care." There is nothing in the regulations which prevents or limits an individual's exercise of choice in selecting physicians or hospitals. The regulations do not infringe upon this freedom of choice. They do serve to impede the inefficient or unbridled use of PIP medical-expense benefits. By appellants' logic, any medical cost-contain-

ment measure might be characterized pejoratively as "managed care." Obviously, financial management is needed or providers are given free reign to bill and treat.

In adopting *N.J.A.C.* 11:3–4, the Commissioner exercised her statutory authority in a measured but rigorous manner, in recognition of the importance of quality health care for injured automobile accident victims. For example, the Department could have selected maximum treatment limits, as provided under the Individual Health Coverage Program (IHC) and the Small Employer Health Program (SEH). *See N.J.A.C.* 11:20–1.1 to –20.2, and 11:21–1.1 to –19.4. Under these programs, health insurers sell plans which impose dollar limits or number-of-visit limits for certain treatments. For example, the IHC program allows a 30–visit maximum for physical therapy services to a covered person per calendar year, *see N.J.A.C.* 11:20, Appendix Exhibit C. Or, a basic benefit system could have been established which introduces concepts more akin to managed care, in which individuals might not be able to select the physician of their choice. Those means were not chosen by the Commissioner.

While the regulations adopted by the Commissioner facially provide consumers with access to an adequate quality of health care in our opinion, AICRA's mandate to balance the reparation's objective and the cost-containment aspect of the no-fault act was manifest and could not be ignored. Throughout the course of the legislative hearings before the Joint Committee on Automobile Insurance Reform, the Committee members were reminded that PIP medical expenses have been the subject of fraud, abuse, and overutilization. For a good example:

ASSEMBLYMAN CHARLES: One of the things that we've been hearing about during this testimony by some who believe that the small claims are being inflated, who feel that nonexistent claims or injuries are being made to appear as real injuries, is the claim that there are a lot of exotic tests that are being used now to satisfy the objective injury criterion of the law. One of these things that we've heard here is that these new tests come up, you've never seen them before, and suddenly they appear.

[February 9, 1998 Joint Committee on Automobile Insurance Reform, at 16.]

At that same Joint Committee hearing, other individuals testified that physicians order magnetic resonance imaging tests (MRI's) across the board in all cases, because attorneys tell them that, without an MRI, it is difficult to pierce the verbal threshold. (February 9, 1998, Joint Committee hearing at 121.) There is no question that the Legislature intended, when it directed the Commissioner to adopt regulations implementing AICRA, to establish some standard of measure and a mechanism to check the prior abuses of the system.

Clearly, AICRA was designed to reduce not only unnecessary PIP medical costs but also to reduce payments on the bodily injury component of auto policies. In § 11 of AICRA the insured may elect the less-expensive "limitation on lawsuit option" or the more-costly "no limitation on law suit option," § 11 codified as *N.J.S.A.* 39:6A–8(a) and (b), respectively. If the "limitation on lawsuit option" is selected the insured must establish death, dismemberment, significant disfigurement or scarring, displaced fractures, loss of fetus, or a permanent injury within a reasonable degree of medical probability certified by a physician. *Ibid.* Under § 16, codified as *N.J.S.A.* 39:6A–12, an injured plaintiff may not prove medical expenses paid by PIP benefits in a common-law action. However, § 16 of AICRA, also codified as *N.J.S.A.* 39:6A–12, permits unlimited recovery "of uncompensated economic loss sustained by the injured party." In Governor Whitman's Conditional Veto Message dated April 27, 1998, when she returned Senate Bill No. 3 to the Legislature for reconsideration, the Governor said:

> The 1998 [verbal] threshold has not worked. By allowing recovery for injuries that are nonpermanent, *i.e.* that heal, and for fractures that are not serious, the statute has not served as a meaningful limitation to control premium costs. Because the substantive standards are so nebulous, moreover, they have encouraged the employment of extensive and superfluous medical and chiropractic testing and treatment in order to establish standing to sue for pain and suffering. The substantial increase, since 1988, in the cost of medical expense benefits is the best indication that those benefits have been manipulated in order to frustrate the intent of the lawsuit [verbal] threshold.

> [Governor's Reconsideration Message to *S.* 3, First Reprint, April 27, 1998.]

The establishment of standard treatments and diagnostic tests established in *N.J.A.C.* 11:3–4 are consistent with the legislative intent to discourage the performance of unnecessary medical services. The regulations are designed to provide all necessary medical care to those injured accident victims in need of treatment. They neither deny patients access to care nor interfere with physicians' ability to practice medicine. What the regulations do, however, consistent with AICRA's objective, is to establish meaningful standards against which to measure the reimbursement of medical treatments and diagnostic tests. We conclude the regulations are authorized by AICRA's plain language and consistent with the legislative intent.

Statistics support the conclusion that New Jersey's generous medical expense benefits, which provide greater benefits than virtually all other states with "no-fault" insurance, have long been subject to the types of abuse that AICRA's comprehensive reforms are designed to control. New Jersey has been ranked first nationally in average cost of care for automobile accident injuries, duration of treatment, and number of provider visits. 30 *N.J.R.* 3211. Surveys showed that the average cost of treating a whiplash injury in New Jersey is nearly twice as high as the average cost of treating the same injury in other states and that New Jersey possessed the highest average length of treatment and the highest number of doctor visits per claim. *Ibid.* Other studies have revealed very high ratios of bodily injury claims per accident; for example, a Congressional study found that in one of this State's major cities there were 80 bodily injury claims for every 100 accidents — 244% more than the national average. Such statistics persist despite New Jersey's longstanding no-fault laws which were intended to limit bodily injury liability claims to more serious injuries. The high costs associated with such alarming figures is initially borne by the State's automobile insurance system and ultimately passed on to the State's consumers. In enacting AICRA, the Legislature was determined to change this situation and to make insurance more affordable.

## IV–B

The second principal objection by appellants relates to adequate consultation with and consideration of the concerns of the professional boards. The Legislature delegated to the Commissioner the authority to establish basic benefits and to designate standard treatment protocols and diagnostic tests. Nothing in AICRA delegates this authority to any other agency or entity. This was the Commissioner's job, although she could consult with her own hired consultant, Price Waterhouse Coopers, the other governmental bodies and agencies, and listen to the public at the November 4, 1998 public hearing on these regulations and through thousands of communications from various professionals and ordinary citizens during the public comment period. Certainly in giving to the Commissioner the sole and ultimate responsibility, the Legislature recognized that other entities or individuals would have competing views which might not harmonize with the goal of providing reasonably necessary health care while also achieving the compelling goal of cost-reduction.

The record reveals the Commissioner did consult with each of the professional boards. The consultation called for by AICRA does not require the boards to endorse or approve of either the regulations or the standards contained in them.

The February 24, 1999 statement of the State Board of Medical Examiners is illustrative of the consultation which ensued. The statement in relevant part says:

> The proposed [Department] rules were on the agenda at the Board's October 14 [1998] meeting, at which members of the public were heard on the issue. A formal written comment was provided to [the Department] on November 4, a copy of which was subsequently provided to all Board members at the November 12 meeting. Board President Robbins personally met with Commissioner LaVecchia on November 10; they discussed each and every one of the written comments....

> A number of constructive comments were contained in that submission, many of which were reflected in the [Department's] rule in its adopted form.... In urging these clarifications, the Board has provided valuable input and the necessary consultation....

Through the ad hoc committee process and the formal written comment, the Board has discharged its responsibility to provide consultation to the Department as required by statute.

On November 4, 1998 the Board of Medical Examiners stated with regard to the Commissioner's formulation of *N.J.A.C.* 11:3–4 in the brief time period available: "We congratulate you on your formidable accomplishment."

Another statement, adopted by unanimous vote of the Board of Dentistry, described the consultative process, including the representation of the Board on the *ad hoc* committee, the submission of relevant articles for the medical management of traumatic injuries, and preparation of lists of valid diagnostic tests useful for diagnosing and treating traumatic injuries, such as TMJ dysfunction. The Board of Dentistry did not provide comment to the medical protocols or the care paths because they did not relate to dental injuries. The Board of Dentistry concluded that it did engage in necessary consultation with the Department. The Board of Physical Therapy described its own consultation process. The Board said it did not believe it was required to approve or endorse the regulations. Board President Kirsch did, however, express the general view that the care paths "seem to represent appropriate guidelines...." Similar statements were made by the Board of Psychological Examiners. While the Board of Chiropractic Examiners made clear that it did not endorse the care paths, its own statements and the agency rulemaking record reveal that its positions were noted and addressed. There is no dispute that even though the Department and the Board of Chiropractors did not reach concurrence on the regulations, Department officials engaged in personal dialogue with members of that Board before the rule was adopted. The Board submitted comments to the proposed regulations, was represented at the public hearing, and the Department made several amendments to the regulations based on the Board's recommendations, providing for osteopathic manipulations for Care Paths 1, 3 and 5 and an increased number of treatment visits. The Department thus

fulfilled the legislative mandate to consult with the professional boards.

Although the Legislature could have done so, there is no basis to construe AICRA to have delegated the authority to develop standard medical protocols to one or more of the professional boards. Nor did AICRA require the Commissioner to engage in a joint rulemaking with one or more of the professional boards. *See N.J.A.C.* 1:30–1.2 (" 'Joint Proposal and Joint Adoption' is the process by which two or more agencies, with concurrent or complementary jurisdiction, jointly propose and adopt identical rules, at the same time. The process may be mandated by legislation or voluntarily initiated, where appropriate."). Nor did AICRA require one or more of the professional boards to approve of or endorse the regulations adopted by the Commissioner. In the same legislation where the Legislature intended one agency to approve the action of another agency, the Legislature clearly expressed its intent by requiring the Commissioner to "approve" of the list of diagnostic tests promulgated by rule by the professional boards. *See L.* 1998, *c.* 12, codified at *N.J.S.A.* 39:6A–4.7, where the Legislature instructed the professional boards to promulgate rules adopting valid diagnostic tests which, once "approved" by the Commissioner, would apply to benefits provided in the standard and basic automobile insurance policies.

Rather, in the relatively abbreviated, four-month time frame for this complex task — from the date that AICRA was signed into law to the expiration of the 120–day period in which the Legislature directed the Commissioner to develop the necessary regulations — AICRA authorized the Commissioner to enlist the services of a benefit consultant to assist in the development of the regulations, and to consult with the professional boards. The Department accomplished this task. In this context, we are quite satisfied that "rational" and "meaningful" consultation and exchange of views occurred. *See Board of Education v. Deptford Township,* 225 *N.J.Super.* 76, 83–84, 541 *A.*2d 1080 (App.Div.1988),

*affirmed in part and reversed in part,* 116 *N.J.* 305, 314–15, 561 *A.*2d 589 (1989).

We reject appellants' contention that AICRA and the extant case law somehow required the professional boards to develop the treatment protocols. Appellants' contention that the Commissioner and her staff may lack expertise in medical matters is recognized. But this was the path the Legislature chose and it provided for adequate consultative assistance. We think this course was rational and averted a process in which a clamor of competing individuals, many motivated by economic self-interest or without familiarity or sympathy with the regulatory process, could block or severely delay implementation of a plan designed to correct a situation of compelling economic concern. We conclude the Commissioner acted within her authority in discerning the main areas of abuse. She and her staff, in proper consultation, could best ascertain how treatment and diagnostic tests are overutilized by individuals who try to pierce the verbal threshold in order to gain standing to sue.

Appellants next challenge the care paths as unsupported by medical evidence. They strongly criticize the role played by PWC, the consultant hired by the Commissioner to aid in their development. The PWC consulting team, which assisted the Department in developing the basic benefits and identifying standard treatment protocols and diagnostic tests, consisted of three doctors, two nurses and a health-care specialist, with expertise in case management, workers' compensation and in the development of care protocols. We note the care-path regulatory scheme is not unlike the "controlled care" system in workers' compensation which has generally performed well for many years in this State. *N.J.S.A.* 34:15–15.

PWC reviewed extensive health-care industry protocols, standards and criteria for the treatment of injuries to the spine and back, and searched pertinent, recently-published professional articles. The initial report prepared by PWC, which served as the

basis for the Department's rule proposal, reflects the result of PWC's research and its dialogue with the Department.

The medical publications relied on by PWC and the Department represent a diverse collection of timely and nationally-recognized sources. These materials include multiple volumes of industry-accepted health-care management guidelines and professional articles from generally respected sources, such as The New England Journal of Medicine, and the Royal College of General Practitioners. PWC also examined and relied upon the professional literature relating to spine and whiplash injuries, some of which had been published at or near the same time that AICRA was enacted in 1998.

PWC's report contains an extensive bibliography citing nationally-accepted industry health-care management guidelines, professional articles, and other articles from multi-disciplinary sources. Sources included in this bibliography include: "Clinical Practice Guideline" for acute low back problems in adults, published by the U.S. Department of Health and Human Services, Agency for Health Care Policy and Research; the Mercy Center Consensus Conference "Guidelines for Chiropractic Quality Assurance and Practice Parameters;" and the State of New York Worker's Compensation Board of Medical Guidelines. These sources, along with others, were determined by PWC and the Department to contain commonly-accepted professional standards beneficial for the treatment of automobile-related injuries to the neck and back.

In addition to this medical literature, the Department reviewed the literature and medical guidelines provided by the medical community and the professional boards. The Council of New Jersey Chiropractors, for example, urged the wholesale adoption of the "Forum Guidelines," claiming that they contain the most appropriate clinical guidelines for chiropractic care. The Department considered and ultimately rejected this suggestion because the Forum Guidelines actually set no standards against which to measure the medical necessity of treatments or diagnostic tests. The Forum Guidelines merely establish the full scope of services

which can be provided by licensed chiropractors in treating patients in any particular case; this would hardly have fulfilled the express mandate of a legislature searching for cost-controls relating to reasonable courses of treatment. 30 *N.J.R.* 4405. Indeed, a refusal by the Department to adopt objective standards against which treatment could be measured, with deviations warranted by medical necessity, would have violated AICRA's express mandate. *See N.J.S.A.* 39:6A–1.1.

Both PWC and the Department considered reliable medical literature in establishing standard treatment protocols. The large volume of the available medical literature on the subject, and the disparity among the various described and other available standards established that there truly was no universal consensus among health-care providers on the diagnosis, treatment and duration of therapy for injuries to the neck and back. 30 *N.J.R.* 4405; *see also* 30 *N.J.R.* 4406, where the Department explains it would not adopt Florida's chiropractic guidelines and rejects the use of another set of chiropractic standards which encouraged the use of medically unnecessary diagnostic tests.

The medical literature relied upon by PWC supports the Department's contention that the care paths are derived from credible medical evidence. Nor will we criticize PWC's use of foreign medical sources. For instance, we see no reason for rejection of Canadian data on the time for back and neck injuries to heal.

Many of the protesting organizations relied upon by the appellants expressed dissatisfaction over elimination of reimbursement for diagnostic tests used in their particular discipline. For example, the American Academy of Pain Management urged the Department not to restrict computer-aided diagnostics and tomography for TMJ disorders; the American Equilibriation Society raised a similar concern. The University of Medicine and Dentistry of New Jersey (UMDNJ) at Newark and Camden asked the Department to consider allowing the use of CT scans not just for brain injury disorders, but for injuries to any part of the body. The American Journal of Pain Management, the University of

Pennsylvania Medical Center, the Journal of Craniomandibular Practice, the American Academy of Gnathologic Orthopedics, the American Dental Association, and the American Academy of Head, Neck and Facial Pain asked the Department to allow surface EMG, mandibular tracking, and sonograph to be used for diagnostic purposes. A board-certified neurologist urged the Department to continue to permit reimbursement for neuroimaging diagnostic tests. All of the diagnostic testing criteria contained in the regulations are based on the recommendations of the *ad hoc* committee of State professional boards.

While other organizations to which appellants refer provided general comments on the protocols, most sought clarification of terms that were defined in the regulations. For example, the New Jersey Hospital Association requested clarification on the terms "disfigurement," "treating health care provider," and "brain mapping." The National Association of Social Workers urged the Department to add licensed social workers to the list of health-care providers in *N.J.A.C.* 11:3–4.2.

Other organizations to which appellants refer, such as the Rehabilitation Institute at Morristown Memorial Hospital, asked that insurers be permitted to impose precertification and decision point review requirements even during the first ten days of an insured event, which requirements the regulations now prohibit. That commenter did say "that the new proposed regulations are a significant step in the right direction." Some health-care providers, such as UMDNJ at Camden, while expressing displeasure over the apparent elimination of certain diagnostic tests, believed that "the majority of [the protocol] rules seem appropriate...." The American Physical Therapy Association, while suggesting certain changes be made to the care paths, believed that "[t]he care paths are well charted and the regulations are very clear with respect to those diagnostic tests and treatments which are not acceptable."

In sum, we perceive that at the heart of the many physician (and attorney) challenges to the protocols is their inherent opposi-

tion to the concept of protocols, the cornerstone of AICRA's legislative reform. The physicians' understandable preference for reimbursement for treatment and services without regard to inhibiting standards or guideline constraints is fundamentally and irreconcilably in conflict with AICRA's mandate. The concerns of the fifty-two organizations appellants cite in conflict with the regulations represent core public policy disagreements. They do not overcome the presumption of validity accorded agency regulations. *Medical Society of New Jersey v. Department of Law & Public Safety*, 120 *N.J.* at 25, 575 *A.2d* 1348. None of the appellants has furnished us with a nationally-recognized paradigm for treatment of soft-tissue neck and back injuries from auto accidents, certainly none which these care paths flout.

We also conclude that the care paths are internally consistent. We find they constitute a workable and understandable scheme. Appellants claim that "[t]he care paths allow no diagnostic tests or x-rays to be conducted within the first four weeks of an accident. . . ." This statement overlooks *N.J.A.C.* 11:3–4.6(d), which states "[t]he care paths do not apply to treatment administered during emergency care." Emergency care is presumed when medical care is initiated at a hospital within five days of the accident. *N.J.A.C.* 11:3–4.2. The criticism also ignores the language of *N.J.A.C.* 11:3–4.7(e) and –4.8(b), which provide that the care paths do not apply to any medical care rendered during the first ten days following an accident. This statement also disregards Exhibit 2 to the regulations, which provides an overview of the treatment of accidental injuries to the spine and back. Exhibit 2 makes clear that for cervical, thoracic and lumbar-sacral spine injuries, the first step in treating a patient involves, and logically so, a clinical evaluation by the appropriate health-care provider. Such an evaluation may include x-rays, CT scan, and an MRI, if necessary. Finally, the Department recognizes that the new regulations do not include an exhaustive reference to all medical diagnostic tests; there may be tests, such as blood tests, which could be appropriate based on the standard of medical necessity. *N.J.A.C.* 11:3–4.5.

Appellants also claim that the care paths are predicated on the date of an accident, as opposed to the date when treatment begins. This is inaccurate. The vast majority of persons injured in automobile accidents seek medical treatment or observation immediately or shortly after the accident. For those injured individuals who experience symptoms and then seek treatment several days following an accident, nothing in the regulations prevents appropriate medical care. The regulations place an individual into a care path upon commencement of treatment for an injury, not upon the occurrence of an accident. For injuries other than those involving the neck and back, for which the six care paths are developed, no care path applies. *See N.J.A.C.* 11:3–4.6(a). The placement into a care path takes place when the injury is first treated and occurs only if the injury falls within the types delineated in one of the six care paths.

Appellants also maintain that the care paths develop two sets of standards of medical care — one set for victims of automobile accidents, and a second set for all other patients. This contention is erroneous; nothing in the regulations alters the standard of medical care to be provided to victims of accidents. Rather, the care paths develop standard treatment protocols, pursuant to AICRA's statutory mandate, against which the reimbursement under automobile insurance policies can be measured. Deviations from the standards set forth are permitted where warranted by medical necessity, in accordance with the regulations.

Even assuming for argument purposes that the regulations establish a disparate standard of treatment, appellants do not identify what this standard is being measured against. Indeed, appellants do not present any other standard treatment program they say is superior. Regardless of the type of insurance an individual treated for a neck or back injury may have, whether a traditional health indemnity policy, HMO coverage, Medicare, or an automobile insurance policy, the patient should not be subject to unnecessary medical treatments or diagnostic tests, or take advantage of overutilization. The abuses stemming from overutili-

zation of benefits under personal injury protection policies are a concern over which the Legislature has expressed grave concern. Because of the relationship between high medical expenses and the likelihood of success in piercing the verbal threshold in bodily injury suits, automobile insurance medical expenses have been subject to much greater abuse than their health insurance counterparts. Limiting medical treatments and tests to those that are medically necessary does not necessarily create a dual standard of medical care. Indeed, the legislative goal appears to be a single, legitimate standard.

Appellants also erroneously claim that the care paths do not address the manner in which individuals who suffer from multiple injuries should be treated, or the manner in which a patient who moves from one care path to another should be treated. An individual who sustains an injury defined by one of the six care paths should, unless otherwise warranted by medical necessity, be treated for that injury in accordance with the provisions of the applicable care path. A patient who sustains an additional injury not defined by the care paths — for example, an individual who suffers a broken leg, is treated for that injury without regard to the care paths. *N.J.A.C.* 11:3–4.6(a). (Exhibit 2 to the care paths provides that the six care paths "address the three anatomical areas of spinal injuries" and "have been developed for the conditions noted . . . .").

The regulations also recognize that "[d]eviations [from the care paths] may be justified by individual circumstances, such as pre-existing conditions and/or co-morbidities." (*See* Note to care paths 1 through 6.) Care paths 1, 3, and 5 (which pertain to the less severe injuries to the cervical, thoracic and lumbar-sacral spine) expressly provide for the transfer to care paths 2, 4, or 6, as appropriate, if the patient eventually presents with or develops radiculopathy or a herniated disc. The care paths provide a clear and direct response to the perceived misunderstanding of how to treat a patient whose medical condition necessitates transfer from

one care path to another. These concerns have been addressed by the Department in responses to public comments.

Appellants next raise the specter of patients undergoing unnecessary surgery under care paths 2, 3, and 6 after only four weeks of conservative treatment. This contention is also misleading. Care paths 2, 4, and 6 provide that a patient with a herniated disc or radiculopathy who, after four weeks of conservative therapy, experiences progressive neurologic deficit should be referred for further diagnostic evaluation. If that patient does experience progressive neurologic deficit four weeks after sustaining the injury, the patient should still undergo additional diagnostic evaluation if there is no improvement in symptoms based on objective findings. Only if the diagnostic test results are positive for surgery, and only if the patient agrees to undergo surgery, will a referral for surgery be appropriate. The notion that the new regulations either force patients to undergo surgery or rush them to the operating room is unfounded.

Another inaccuracy concerns appellants' claim that a patient, who is not improved after eight to twelve weeks of treatment, must undergo an independent medical examination performed by the insurance carrier, and thereafter, either be discharged from care or directed to enter a treatment program operated by the carrier. A review of the regulations reveals that the process is not as limited as appellants suggest and affords patients multiple steps to ensure that an extensive, independent review of the patient's medical condition is undertaken before the patient is no longer eligible for reimbursement for medical care. The right of the insurer to require the patient to undergo a so-called independent medical examination (IME) is not expanded by AICRA. The so-called IME's have always been available to the carrier or the defense in this State. Nor does AICRA alter or expand the insurer's ability, established by prior-existing law, to deny reimbursement for treatments and tests the insurer believes are medically unnecessary. These AICRA regulations establish standards pursuant to which insurers may even find it more difficult to

deny reimbursement, where the patient and provider conform to the norms established. *Compare N.J.S.A.* 39:6A–13, *L.* 1972, *c.* 70, § 13, as amended by *L.* 1993, *c.* 186, § 1 (authorizing insurer to discover any facts regarding personal injury protection benefits claimed, requiring the injured person to provide all relevant information to the insurer upon demand, and allowing insurer to require individual seeking benefits to submit to an independent physical or mental exam).

A patient whose symptoms are not improved after approximately eight weeks of treatment may seek a second opinion, referred to as a second consultative opinion in the regulations, in order to determine whether, and to what extent, additional medical care may be necessary. *See* care paths 1, 3, and 5. *See N.J.A.C.* 11:3–4.6(b). This second opinion is rendered following a physical examination by a physician of similar specialty as the treating physician. 30 *N.J.R.* 3218. The independent physician "may support, refute, or provide alternatives to the current diagnosis and treatment plans." *Ibid.* If additional treatment is medically appropriate, the patient's doctor and the independent physician formulate an agreed-upon treatment plan. Nowhere do the regulations provide that additional care will be dictated by the independent physician. If, on the other hand, the independent physician concludes that no additional treatment is medically necessary but the treating provider and the patient believe that such is warranted, the patient can initiate the insurer's internal appeals procedure for the review of disputed claims. *See N.J.S.A.* 17:29E–10. If the insured remains dissatisfied with the final opinion issued on behalf of the insurer resulting from the internal appeals procedure, the patient or the provider, if appropriate, can then commence the PIP dispute resolution process set forth in *N.J.A.C.* 11:3–5.2 to – 5.12. (See Appendix A.) This process allows the independent dispute resolution organization (DRO) to review the case and, if appropriate, refer the medical issues for determination by an independent medical review organization (MRO). *See N.J.A.C.* 11:3–5.4(b)(4) and –5.2. The availability of the multiple levels of review ensures a patient's treatment is not improperly terminated

without the benefit of independent scrutiny. This process guards patients against arbitrary determinations and tends to assure they will continue to receive necessary medical care.

Appellants also lament the alleged limitation on treatment choices afforded by the care paths. Specifically, appellants contend that a patient who shows improvement after eight to twelve weeks of treatment "must be discharged from treatment even if continuing to have symptoms." The care paths make clear that discharge is warranted where there is an "improvement in symptoms based on objective findings." *See* care paths 1–6, four-weeks post injury. The term "improved" refers to the condition where no additional treatment is medically necessary; the care paths simply do not repeat what the term "improvement" means in the eight-to-twelve week status, as that term is expressly discussed at an earlier point in treatment. If a patient needs additional treatment, the patient always has the right to submit the matter to the insurer's internal appeals procedure and, thereafter, to initiate the PIP Alternative Dispute Resolution process.

The other alleged infirmities in the care paths which appellants complain about are not persuasive. For example, appellants refer to an apparent inconsistency regarding the treatment flow charts in care paths 1, 3, and 5. This contention is meritless. For a cervical-spine soft-tissue injury, a determination is made after four weeks of treatment on whether the patient has shown an improvement in symptoms based on objective findings. If there has been such improvement, the question becomes whether the patient's symptoms have "resolved" or "minimally resolved." If the patient's symptoms have not improved, a determination regarding future treatment is then made, by first deciding whether the patient has complied with the treatment plan.

Appellants also inaccurately claim that a patient sustaining a cervical-spine soft-tissue injury that is "minimally resolved" after four weeks of treatment, and is in compliance with the treatment plan, receives tests but no treatment, while the insured who suffers a thoracic or lumbar-sacral soft-tissue spine injury that is

"minimally resolved" receives treatment but no tests. Review of care path 1 (cervical-spine soft-tissue injury) reveals the inaccuracy of appellant's contention. A person sustaining a cervical-spine soft-tissue injury will undergo diagnostic reevaluation and additional treatment so long as the medical condition being treated is related to the accident and is medically necessary. The diagnostic reevaluation of the patient in care path 1, which is not present in care paths 3 or 5, is not a fatal flaw under these circumstances, especially where, under all three care paths, the patient is entitled to all necessary and causally-related medical treatment.

Appellants are also incorrect in their claim that patients cannot obtain psychiatric treatment during the first four weeks of treatment. Psychiatric treatment does not fall within any of the six care paths. As a result, psychiatric care may be requested and obtained when medically necessary and causally related to the accident, even within the first four weeks of an injury. Appellants identify nothing in the new regulations that precludes this.

Finally, appellants wrongly maintain that the regulations do not consider a patient's age, sex, history, pre-existing condition(s), or co-morbidity. The regulations expressly provide that "[t]reatments must be based on patient need and professional judgment. Deviations [from the care paths] may be justified by individual circumstances, such as pre-existing conditions and/or co-morbidities." 30 *N.J.R.* 4413.

In sum, since the Department properly exercised its express statutorily-delegated authority in adopting the regulations, we must uphold the regulations. The establishment of basic benefits, standard treatment protocols and diagnostic tests, provided for in *N.J.A.C.* 11:3–4, is expressly authorized by AICRA. Not only is *N.J.A.C.* 11:3–4 authorized by the plain language of AICRA, it rationally serves the legislative public policy of ensuring that medically necessary care is reimbursed while placing limitations on medically unnecessary treatments and diagnostic testing; this will result in lower insurance premiums for New Jersey consumers. Appellants' criticisms of the care paths fall short of overcom-

ing the presumption of validity and reasonableness accorded to the Department's regulations.

## V

In addition to the joint challenges by the Coalition and ATLA to the care paths, treated above, ATLA advances several independent challenges to other sections of the regulations. In the circumstances, we find that ATLA meets the standing requirements of "real·adverseness" set out in *N.J. Chamber of Commerce v. N.J. Election Law Enforce. Comm.*, 82 *N.J.* 57, 67, 69, 411 *A.*2d 168 (1980), and may pursue its challenge.

ATLA challenges the DOBI's regulation which provides that insurers may offer optional comprehensive and collision coverage to purchasers of a "basic policy." The mandatory coverages enumerated in Section 4 of AICRA, codified as *N.J.S.A.* 39:6A–3.1, and describing the "basic" policy, do not include comprehensive and collision coverage. ATLA says this prohibits these coverages in the basic policy, especially because the policy's costs will increase. The language of section 4 covers only the traditional first-party PIP medical expense and third-party liability coverages ($5,000 property damage liability and optional $10,000 bodily injury coverage). The previously mandatory bodily injury coverage becomes optional.

The statute is silent on the traditional physical damage coverages — comprehensive and collision. AICRA purports neither to amend nor to repeal the statute governing comprehensive and collision coverage. *N.J.S.A.* 17:29A–39, which provides that "[e]very private passenger automobile insurance policy providing collision and comprehensive coverages, issued or renewed on or after the effective date of this act [January 1, 1983], shall provide a deductible in a minimum amount of $500.00 each for collision and comprehensive coverages, unless the named insured selects a lower deductible amount." *L.* 1983, *c.* 65, §· 10, codified at *N.J.S.A.* 17:29A–39. We conclude that insurers are able, under

this existing law, to offer comprehensive and collision coverage as an option to both their standard- and basic-policy customers.

ATLA's contention that AICRA prohibits the offer of comprehensive and collision coverage to basic-policy consumers would effect an implied repeal of *N.J.S.A.* 17:29A–39. Implied repealers are disfavored. *Mahwah Twp. v. Bergen Cty. Bd. of Taxation,* 98 *N.J.* 268, 280–81, 486 *A.*2d 818, *cert. denied,* 471 *U.S.* 1136, 105 *S.Ct.* 2677, 86 *L.Ed.*2d 696 (1985) (a repeal by implication requires clear and compelling evidence of the legislative intent free from reasonable doubt); *Swede v. Clifton,* 22 *N.J.* 303, 317, 125 *A.*2d 865 (1956) (presumption against repeal by mere implication; "where the statutory provisions may reasonably stand together, each in its own particular sphere of action, there is not the repugnancy importing the design to repeal the earlier provision"); *Yacenda Food Management Corp. v. New Jersey Highway Authority,* 203 *N.J.Super.* 264, 274, 496 *A.*2d 733 (App.Div.1985) ("[t]he doctrine of implied repeal is disfavored in our law unless the later expression of the legislative will is so clearly in conflict with the earlier statute that the two cannot reasonably stand together. The test is whether the laws are inconsistent or repugnant."). We find no irreconcilable inconsistency or clear evidence of legislative intent to support ATLA's contention that Section 4 of AICRA, establishing the basic policy, and *N.J.S.A.* 17:29A–39, governing comprehensive and collision coverage, cannot reasonably abide together.

ATLA's support for its challenge to the regulation is a letter written by a Senate Sponsor of the bill only after the legislation was enacted and the Department's implementing regulations promulgated. While contemporaneous sponsor statements are frequently used as extrinsic aids to legislative intent, post-enactment statements of legislators on legislative intent have been disapproved; they are of limited legal value to understanding the clear meaning and legal effect of statutes. *Essex Crane Rental Corp. v. Director, Div. on Civil Rights,* 294 *N.J.Super.* 101, 682 *A.*2d 750 (App.Div.1996); *see also Dumont Lowden, Inc. v. Han-*

*sen*, 38 *N.J.* 49, 56, 183 *A.*2d 16 (1962) ("it has not at any time [been] suggested that [a court] would approve the extraordinary course of taking testimony of individual legislators as to their actual intent or understanding when they voted upon the legislation."). *See* 2A *Singer's Sutherland Statutes and Statutory Construction* § 48.20 (1999 and Supp.).

ATLA also relies on a comment by a Senate staff aide during a March 23, 1998 Joint Committee Hearing which was made before the final legislation was actually drafted. This statement, even if relevant, is not inconsistent with the challenged regulations, since collision and comprehensive coverages are not included as mandatory coverages in the basic policy. Indeed, these coverages have always been optional. ATLA points to no persuasive support for its contention that there is an express or implied indication of a legislative intent contrary to this regulation. The argument is insufficient to overcome the presumption of validity of the Department's interpretation of the legislation.

The Legislature is presumed familiar with prior legislation. *In re County of Mercer*, 172 *N.J.Super.* 406, 409, 412 *A.*2d 461 (App.Div.1980). If it intended to amend *N.J.S.A.* 17:29A–39 or to prohibit the sale of comprehensive and collision coverage to basic-policy consumers, it would have been an easy matter to have expressed such an intent. In the absence of such a statement, we will interpret the existing statutes in a "unitary and harmonious" manner to achieve the overall legislative scheme in a reasonable manner. *Lawrence v. Butcher*, 130 *N.J.Super.* 209, 212, 326 *A.*2d 71 (App.Div.1974).

There are sound policy reasons to allow the sale of optional comprehensive and collision coverage to purchasers of the basic policy. Individuals who are looking for a low-cost alternative to the standard policy may need to lease or finance their vehicles. The consumer's ability to purchase comprehensive and collision coverage may be the only way to obtain necessary financing or approval by a lessor. There is no question that the availability of optional comprehensive and collision coverage to basic-policy pur-

chasers is consistent with the overall legislative intent to provide individuals who are otherwise unable to afford the purchase of a standard policy with a lower-cost alternative.

There is no clear legal support for the Commissioner to bar an insurer which wants to offer optional comprehensive and collision coverage for sale with the basic policy. There is no basis to deny a basic-policy consumer the ability to purchase insurance from a company which chooses to offer optional comprehensive and collision coverage. Insurers have traditionally offered optional comprehensive and collision coverage to their insureds. If the Commissioner were to prohibit the sale of these optional coverages to basic-policy consumers, a new insurance market would likely develop to sell stand-alone comprehensive and collision coverage — a market which the Department claims it has historically discouraged.

The offer of optional comprehensive and collision coverage is fully consistent with prior legislative amendments to the insurance laws and the thrust of AICRA's legislative scheme, which is to allow consumers a range of options and choices, best suited for their personal and economic needs. An AICRA fundamental theme is not only affordability but also access to insurance. (*See* February 9, 1998, Joint Committee on Automobile Insurance Reform, hearing transcript at 27–28, discussing need for consumer choice in order to reduce costs.) The regulations allow consumers the option of purchasing the minimal basic policy ATLA would force upon them. However, there is no support for ATLA's contention that the Commissioner somehow has an affirmative obligation to make the basic policy as unattractive as possible, or practically unavailable, and that she must discourage consumers from purchasing the basic policy.

*Amicus* BIANJ claims that the offer of comprehensive and collision coverage in the basic policy will encourage individuals to purchase less expensive coverage and encourage individuals to unwittingly subscribe to $15,000 personal injury protection medical expense benefits — an amount which BIANJ claims is inade-

quate to cover most traumatic injuries. The fact that the Legislature established that amount as the mandatory PIP coverage under the basic policy evinces the Legislature's disagreement with the premise of BIANJ's contention concerning the adequacy of the coverage amount.

During the hearings conducted by the Joint Committee on Automobile Insurance Reform, witnesses repeatedly stated that over 85–percent of accidents require less than $15,000 worth of medical treatment. As a result, AICRA provided $15,000 of medical-expense coverage to basic policy holders and also allows standard policy holders to select a $15,000 medical-expense benefit option. (*N.J.S.A.* 39:6A–4.3(e).) In order to address public concern, including those voiced by BIANJ that a $15,000 limit on medical treatment may be insufficient to treat various serious injuries, the Legislature created a safety-net provision to cover medical treatments for certain catastrophic injuries in an amount of $250,000. *See e.g., L.* 1998, *c.* 21, § 4(a), codified at *N.J.S.A.* 39:6A–3.1(a).

Because the $15,000 PIP medical-expense option that an individual can select when purchasing a standard policy provided under *L.* 1998, *c.* 21, § 7, codified at *N.J.S.A.* 39:6A–4.3(e), is identical to the $15,000 medical-expense benefit available under the basic policy, neither ATLA's nor BIANJ's arguments persuade us to deny the sale of optional comprehensive and collision coverage to basic policy holders. Neither ATLA nor BIANJ here challenge AICRA's basic premise which allows consumers to purchase a standard policy with an optional $15,000 PIP medical-expense benefit. Nor are they advocating that the Legislature intended to prohibit the sale of comprehensive and collision coverage to standard policy holders who select the $15,000 PIP medical-expense option.

## VI

ATLA contends DOBI's promulgation of *N.J.A.C.* 11:3–5.6(d)(3), the so-called "loser-pays counsel fees" provision, is con-

trary to AICRA, is counter to the long-standing practice under the no-fault statute limiting an award of counsel fees to a prevailing insured in an arbitration or judicial proceeding involving a dispute over the recovery of PIP benefits, and violates the public policy of this State.

*N.J.A.C.* 11:3–5.6, entitled "Conduct of PIP dispute resolution proceedings," prescribes the procedures for resolving disputes concerning payment of PIP benefits. A request for dispute resolution may be made by "the injured party, the insured, a provider who is an assignee of PIP benefits or the insurer." *N.J.A.C.* 11:3–5.6(a). Under the regulation, the dispute is "promptly" assigned to a dispute resolution professional (DRP), and all parties are notified of the identity of the DRP. *N.J.A.C.* 11:3–5.6(b). The issues in dispute may, either by request of any party or at the election of the DRP, be referred for review by a medical review organization (MRO). *N.J.A.C.* 11:3–5.6(c). The decision-making process outlined in the regulation is:

(d) Determinations by the dispute resolution professional shall be in writing and shall state the issues in dispute, the DRP's findings and legal conclusions based on the record of the proceedings and the determination of the medical review organization, if any. The findings and conclusions shall be made in accordance with applicable principles of substantive law, the provisions of the policy and the Department's rules. The award shall set forth a decision on all issues submitted by the parties for resolution.

1. If the DRP finds that the determination of a medical review organization is overcome by a preponderance of the evidence, the reasons supporting that finding shall be set forth in the written determination.

2. The award shall apportion the costs of the proceedings, regardless of who initiated the proceedings, in a reasonable and equitable manner consistent with the resolution of the issues in dispute.

3. *The award may include attorney's fees for a successful claimant or respondent in an amount consonant with the award and with Rule 1.5 of the Supreme Court's Rules of Professional Conduct.*

[*N.J.A.C.*11:3–5.6(d) (emphasis supplied).]

ATLA first contends the Commissioner lacked the authority to promulgate this regulation. DOBI counters that the authority in AICRA for this challenged regulation is contained in *L.* 1998, *c.* 21, § 25, codified in *N.J.S.A.* 39:6A–5.2, as follows:

> g. *The cost of the proceedings shall be apportioned by the dispute resolution professional. Fees shall be determined to be reasonable if they are consonant with the amount of the award, in accordance with a schedule established by the New Jersey Supreme Court.* If the treatment, diagnostic test, or service performed is not determined to be medically necessary or appropriate, the injured person shall not be liable to pay the provider the disputed amount.
>
> [*N.J.S.A.* 39:6A–5.2(g) (emphasis supplied).]

ATLA argues this statutory language does not authorize a regulation permitting an award of counsel fees to an insurance company where the company successfully disclaims responsibility for payment of medical treatment. DOBI argues the language contained in AICRA permits an award of counsel fees to either party to a dispute resolution proceeding because *N.J.S.A.* 39:6A–5.2(g) replaces language in the predecessor arbitration statute requiring payment to a prevailing claimant by the insurer of "all costs of the proceedings, including reasonable attorney's fees, to be determined in accordance with a schedule of hourly rates for services performed, to be prescribed by the Supreme Court of New Jersey." *See L.* 1983, *c.* 362, § 8, codified at *N.J.S.A.* 39:6A–5(c) and renumbered by *L.* 1995, *c.* 407, § 1, and recodified as *N.J.S.A.* 39:6A–5(h).

DOBI also urges that neither the statute nor the regulation actually mandates a "loser-pays counsel fees" system, because while the DRP "*shall* apportion the costs of the proceedings," the "award *may* include attorney's fees," making the consideration of attorney's fees discretionary, and limited to "an amount consonant with the award." *N.J.A.C.* 11:3–5.6(d)(2) and (d)(3) (emphasis supplied). We note, however, the regulation only permits inclusion within the "award" of attorney's fees "for a successful claimant or respondent." *Ibid.* This language suggests that while the loser may not always be required to pay, only the winner may receive attorney's fees.

Our analysis of these arguments focuses on two inquiries. First, did the Legislature intend, by the passage of *L.* 1998, *c.* 21, § 25(g), codified at *N.J.S.A.* 39:6A–5.2(g), that counsel fees may be recovered by an insurer against an insured or injured party in a dispute resolution proceeding? Second, does *N.J.A.C.* 11:3–

5.6(d)(3) reflect the statutory authorization contained in *N.J.S.A.* 39:6A–5.2(g)?

An award of counsel fees to an insured who successfully obtains an arbitration award against an insurance carrier for payment of PIP benefits, or who prevails against an insurance carrier in a lawsuit for PIP benefits, has been the statutory and historical jurisprudence of our State. *See L.* 1983, *c.* 362, § 8, codified at *N.J.S.A.* 39:6A–5(c) and renumbered by *L.* 1995, *c.* 407, § 1, and recodified as *N.J.S.A.* 39:6A–5(h); *R.* 4:42–9(a)(6); *Maros v. Transamerica Insurance Company,* 76 *N.J.* 572, 579, 388 *A.*2d 971 (1978); *Cirelli v. The Ohio Casualty Ins. Co.,* 72 *N.J.* 380, 384–85, 371 *A.*2d 17 (1977); and Cynthia M. Craig and Daniel J. Pomeroy, *New Jersey Insurance Law* § 10:5–2 at 150 (1998). When enacting a change in policy etched into the common law of our State, the Legislature must speak plainly and clearly. *Campione v. Adamar of New Jersey,* 155 *N.J.* 245, 265, 714 *A.*2d 299 (1998); *DeFazio v. Haven Sav. and Loan Ass'n.,* 22 *N.J.* 511, 519, 126 *A.*2d 639 (1956). When interpreting a statute, courts must first look at the evident wording of the statute to ascertain its plain meaning and intent. *Bergen Commercial Bank v. Sisler,* 157 *N.J.* 188, 202, 723 *A.*2d 944 (1999); *Renz v. Penn. Central Corp.,* 87 *N.J.* 437, 440, 435 *A.*2d 540 (1981). Of course, where the language is clear, courts will enforce the statute according to its terms. *Bergen Commercial Bank,* 157 *N.J.* at 202, 723 *A.*2d 944; *Sheeran v. Nationwide Mutual Ins. Co., Inc.,* 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979); *Matter of Vulcan Materials Co.,* 225 *N.J.Super.* 212, 220, 542 *A.*2d 25 (App.Div.1988). The goal of statutory construction is to determine the intent of the Legislature. *Strasenburgh v. Straubmuller,* 146 *N.J.* 527, 539, 683 *A.*2d 818 (1996). A statute's meaning is not evident, however, where varying interpretations of the statute are plausible. *Bergen Commercial Bank,* 157 *N.J.* at 202, 723 *A.*2d 944.

The Legislature has directed that the cost of dispute resolution proceedings be "apportioned by the dispute resolution professional," and that the fees "shall be determined to be reasonable if they

are consonant with the amount of the award,...." *L.* 1998, *c.* 21, § 25, codified as *N.J.S.A.* 39:6A–5.2(g). Concerning the issue of counsel fees, we find the legislative mandate unclear. Curiously, the terms "counsel fees" or "attorneys fees" are not used in the statute. The plain meaning of the statute contemplates that fees must be related to and "consonant with" the "amount of the award." The meaning of "consonant" is synonymous with "consistent" or "compatible." *Cross v. Warden, N.H. State Prison*, 138 *N.H.* 591, 644 *A.*2d 542, 543 (1994), *cert. denied*, 513 *U.S.* 1111, 115 *S.Ct.* 901, 130 *L.Ed.*2d 785 (1995); *see* William Statsky, *West's Legal Thesaurus/Dictionary* 176 (spec. deluxe ed.1986). DOBI has interpreted this language as authorizing a discretionary counsel fee award for "a successful claimant or respondent." *N.J.A.C.* 11:3–5.6(d)(3). An equally reasonable interpretation is that for fees to be granted by the DRP there must be an award of money made to the injured party or medical provider and the reasonableness of the fees is determined with reference to whether they are consistent or compatible with the amount of the monetary award. However, if the insurance carrier is successful, there is no "award." Under such an interpretation, attorney's fees could not be granted against an injured party or insured.

DOBI cites to statements made by two legislators during the hearings held by the Joint Committee on Automobile Insurance Reform as evidence of legislative intent to create a "loser-pays counsel fees" system. We reject this argument. We recognize that where an ambiguity exists in the statute, extrinsic aids, such as legislative history, may be used to interpret language beyond that expressly written in the statute in an effort to ascertain the true intent of the legislation. *National Waste Recycling, Inc. v. MCIA*, 150 *N.J.* 209, 224, 695 *A.*2d 1381 (1997); *State v. Szemple*, 135 *N.J.* 406, 422, 640 *A.*2d 817 (1994). However, statements of individual legislators do not represent statements of legislative committees. While either may serve as an aid in statutory construction, the individual's statements cannot "clothe it with a meaning not fairly within its words and purposes." *N.J. Civil Service Ass'n v. State*, 88 *N.J.* 605, 615, 443 *A.*2d 1070 (1982).

Expressions of opinion during legislative hearings certainly may reflect the contemporaneous intention of certain legislators, and may be considered. However, the language of the statute and the findings and declarations made in the statute itself control.

We find nothing in the Legislature's findings and declarations contained in *N.J.S.A.* 39:6A–1.1(b) expressing an intention to permit an award of counsel fees to an insurance carrier against an insured or injured person in the statutory dispute-resolution process. As we have noted, one of the prime objectives of AICRA is to control providers unnecessarily treating persons injured in automobile accidents. Since injured persons are treated in accordance with the medical advice and recommendations they receive, we cannot readily conclude from the statutory language that the Legislature intended to penalize the patient who obtains bad medical advice with the monetary sanction of counsel fees. Evidence of a contrary intent is in fact contained in *N.J.S.A.* 39:6A–5.2(g), directing that the injured party cannot be held liable to pay the provider for treatment, diagnostic tests, or services "not determined to be medically necessary or appropriate" by the DRP. Accordingly, we are not satisfied there is a legislative intent to expose the insured, or injured party, to payment of counsel fees of an insurance company in a statutory dispute-resolution proceeding. We also are mindful that imposing counsel fees in favor of an insurance company may chill resort to the dispute resolution process or even to medical treatment.

Giving due regard to the standard of review and presumption of validity attached to regulations promulgated by DOBI, we are satisfied the disputed regulation, *N.J.A.C.* 11:3–5.6(d)(3), does not reflect the statutory authorization contained in *L.* 1998, *c.* 21, § 25, codified in *N.J.S.A.* 39:6A–5.2(g). The statute directs the DRP apportion the costs of the dispute-resolution proceeding. The statute does not speak to attorney's fees.

In the past, when the Legislature intended to authorize an award of attorney's fees it has expressly and clearly done so. *See N.J.S.A.* 9:2–4(c) (authorizing the court to award counsel fees to a

guardian ad litem in a child custody dispute); *N.J.S.A.* 10:5–27.1 (authorizing an award of counsel fees to a prevailing party in an action brought under the Law Against Discrimination); *N.J.S.A.* 56:12–3 (permitting an award of attorney's fees against a creditor, seller, insurer or lessor who engages in consumer fraud); *N.J.S.A.* 2A:23A–7(b) (authorizing attorney's fees under The New Jersey Alternative Procedure for Dispute Resolution Act); *N.J.S.A.* 26:5C–14 (allowing an award of attorney's fees for violations of the AIDS Assistance Act); *N.J.S.A.* 45:17A–33 (permitting an award of attorney's fees for violations of the Charitable Registration and Investigation Act); *N.J.S.A.* 2A:34–23.3 (providing for attorney's fees for violations of visitation orders); *N.J.S.A.* 56:8–19 (permitting an award of attorney's fees against perpetrator of unfair trade practices); *N.J.S.A.* 56:3–13.16 (authorizing attorney's fees for trade-mark violations); *N.J.S.A.* 40:37A–64 (allowing an award of attorney's fees for legal proceedings in connection with default of a performance bond for county improvements); *N.J.S.A.* 52:4B–8 (authorizing an award of counsel fees under the Criminal Injuries Compensation Act of 1971); and *N.J.S.A.* 2A:18–61.6 (permitting an award of attorney's fees in certain landlord-tenant actions). These listed examples constitute only a few of the numerous instances of express legislative authorization for an award of attorney's fees. For many others *see* Sylvia B. Pressler, Current *N.J. Court Rules* (Gann 1999) Comment *R.* 4:42–9[2.8] at 1365–71. The Legislature has not expressly authorized awards of attorney's fees here. As presently constituted, *N.J.A.C.* 11:3–5.6(d)(3) is an invalid expression of legislative intent and is voided. In view of this determination, we need not address the remaining arguments advanced by ATLA on this point.

## VII

We turn to the remaining dispute-resolution regulations in issue, *N.J.A.C.* 11:3–5.1 to –12. Section 25(e) of AICRA provides that referral of a dispute to a medical reviewer by a dispute resolution professional shall be made "in such a manner so as not

to disclose to the medical reviewers the identity of the insurer, nor shall the identity of the reviewer be disclosed to the insurer." *L.* 1998, *c.* 21, § 25(e), codified at *N.J.S.A.* 39:6A–5.2(e). The dispute resolution professional shall refer the case to the medical review organization (MRO) under certain circumstances described in section 24, codified as *N.J.S.A.* 39:6A–5.1(d) which states:

d. With respect to disputes as to the diagnosis, the medical necessity of the treatment or diagnostic test administered to the injured person, whether the injury is causally related to the insured event or is the product of a preexisting condition, or disputes as to the appropriateness of the protocols utilized by the provider, the dispute resolution professional shall, either at his option or at the request of any party to the dispute, refer the matter to a medical review organization for a determination. The determination of the medical review organization on the dispute referred shall be presumed to be correct by the dispute resolution professional, which presumption may be rebutted by a preponderance of the evidence. Should the dispute resolution professional find that the decision of the medical review organization is not correct, the reasons supporting that finding shall be set forth in the dispute resolution professional's written decision.

Independence of the dispute resolution process was the recurring theme of statements made at the hearings conducted by the Legislature's Joint Committee. To ensure this independence, former Insurance Commissioner Randall recommended that "[n]o [insurance] company would be able to engage the [medical review organization] of its choice. In fact, until it became necessary to exchange certain information, the insurance company wouldn't even know which [medical] review organization had been assigned to its case." Physicians who testified at the hearing also agreed that medical review would have to be "absolutely and totally independent."

In order to ensure the independence of medical reviewers as compelled by AICRA, the Department's regulation maintains the confidentiality of certain records and information. *N.J.A.C.* 11:3–5.10(g) provides that all data or information in the MRO's application for certification shall, with certain exceptions, be confidential and not disclosed to the public. The information which shall be deemed public includes the MRO's certificate of incorporation, the date of the certification and its expiration date, the MRO's address, the names of the MRO's officers and directors, and the

individuals responsible for administering medical reviews. The names of all medical reviewers are available to the public.

The Department contends that in order to protect the identity of the medical reviewer from the insurer, the identity of the reviewer must also be protected from disclosure to the claimant, whether the claimant is an individual insured or a treating provider. This safeguard protects the integrity of the process and allows the medical reviewer to make an independent and fair evaluation without being subject to undue influence by either party to the dispute.

At the conclusion of the proceeding, the determination of the dispute resolution professional and the identity of the medical reviewers are available to the parties. The final decision will also be filed with the Commissioner and subject to public inspection pursuant to right-to-know laws. *See* 30 *N.J.R.* 4441, where the Department responds that final decisions will be public records available for inspection with the name of the injured party redacted in order to respect medical privacy concerns. Other documents related to individual disputes are maintained by the dispute resolution organization, but are not filed with the Department. These documents are not public records, either under the common-law right-to-know or the statutory right-to-know law.

Because neither the background nor the identity of the individual medical reviewers assigned by the MRO to review medical disputes is filed or required to be filed with the Department, the identity is not a "public record" within the meaning of New Jersey's Right–to–Know Law, *N.J.S.A.* 47:1A–2 (defining public records as "all records which are required by law to be made, maintained or kept on file ..."). The Department will not be monitoring individual backgrounds or individual referrals of disputes. Nor will the Department maintain a list of the particular medical reviewers assigned to review a particular file. The identity of the medical reviewer will be made known to the Department, at the same time it is made available to the parties to the dispute, when the final determination is filed.

At that time, the parties to the dispute may avail themselves of the information relating to the identity and background of the medical reviewer. The parties are free to challenge the independence of the review. *See* the standards established in the Alternate Dispute Resolution Statute, *N.J.S.A.* 2A:23A–13. The independence of the medical reviewer will probably not be a significant issue in light of the stringent conflict-of-interest provisions established in the regulations. For example, *N.J.A.C.* 11:3–5.12 prohibits medical reviewers from having any personal and financial interest in proceedings or final determinations.

The cases cited by ATLA in its brief challenging this confidentiality procedure refer to the right of one party to the litigation to cross-examine an expert medical witness testifying for the opposing side. *See e.g., State v. Smith,* 101 *N.J.Super.* 10, 13, 242 *A.*2d 870 (App.Div.1968), *certif. denied,* 53 *N.J.* 577, 252 *A.*2d 154 (1969) ("It is elementary that a party may show bias, including hostility, of an adverse witness.") (citations omitted). The situations are dissimilar. Medical reviewers are not like expert witnesses at a trial, retained by the parties and traditionally subject to cross-examination. The medical review organization and its medical reviewers do not represent either party to a dispute. The medical reviewers are independent, akin to arbitrators or judges, but possess professional knowledge in a specialized medical field. There is no justification to cross-examine the medical reviewer just as there is none to cross-examine a judge or arbitrator. We find no contrary authority. Because the confidentiality provisions in the regulations are mandated by AICRA and fulfill legislative intent, the challenge to *N.J.A.C.* 11:3–5.10(g) fails.

## VIII

*N.J.A.C.* 11:3–5.6(c)(1) provides that in cases involving medical disputes which must be referred to a medical review organization, "[t]he administrator shall refer cases on a random or rotating basis to an MRO that does not have a conflict of interest, in accordance with the administrator's dispute resolution plan."

This provision of the regulation implements section 25 of AICRA, which provides that the dispute resolution organization "shall forward referrals [of medical disputes] to certified medical reviewers on a random basis, so that there is a relatively equal apportionment among all medical reviewers." *L.* 1998, *c.* 21, § 25(e), codified at *N.J.S.A.* 39:6A-5.2(e).

ATLA complains that there is a distinction between random referrals to "medical review organizations" and random referrals to "certified medical reviewers" as set forth in the regulations and AICRA, respectively. ATLA claims that the alleged distinction between the two terms is critical to maintaining impartiality of decisions and that random review between organizations will frustrate the legislative will and result in one reviewer constantly reviewing the same type of injury. This is undesirable and should be avoided. We doubt that this will occur, particularly because AICRA and the regulations require MRO's to show that they have a sufficient number of qualified health-care providers, by specialty, to perform the reviews. *See L.* 1998, *c.* 21, § 25(b), codified at *N.J.S.A.* 39:6A-5.2(b).

Under *N.J.A.C.* 11:3-5.2, an MRO is an organization of health-care professionals licensed in New Jersey and certified by the Commissioner to engage in unbiased medical review of medical care provided to persons injured in automobile accidents. An MRO can be any peer review organization with which the Federal Health Care Financing Administration or the State contracts for medical review of Medicare or medical assistance services. *N.J.A.C.* 11:3-5.2. An MRO can also be any independent health-care review company. *Ibid.* In those instances in which a dispute requires a professional medical determination, the dispute resolution professional refers the file to an MRO. *N.J.A.C.* 11:3-5.6(c). Because AICRA and the regulations contemplate that there can be more than one MRO operating in the State and each MRO must provide review of any given file by utilizing a health-care provider in the same discipline as the claimant's treating provider, the Department's regulations require random referrals to MRO's

rather than random referrals to individual medical reviewers. This is required to effectuate the Act. If random referrals were made to individual reviewers, there could be difficulty in guaranteeing that the assignment is made to a professional with the same medical specialty as the treating provider. *See* 30 *N.J.R.* 4440 (reiterating the same concern in the Department's response to public comment on this issue). We do not envision this random assignment process to MRO's affecting impartiality, as ATLA claims. Because reviewers will be randomly assigned throughout available and certified MRO's, there should be a variety of professional backgrounds and qualifications among the decision makers, subject to the requirement that the medical reviewer is of the same discipline as the treating physician.

We conclude this random referral of files to MRO's fairly implements the legislative mandate of impartiality and integrity. It also allows compliance with the legislative mandate that reviewing physicians be of the same discipline as the patient's treating physician. This manner of random selections to MRO's is a sensible interpretation of AICRA, consistent with the legislative intent. The challenged provision of the regulation is upheld.

## IX

We uphold the DOBI regulations *N.J.A.C.* 11:3–4 and –5 with the exception of the challenge to the attorney's fees regulation in *N.J.A.C.* 11:3–5.6(d)(3). We conclude that the challenges we today reject are fundamentally disagreements with the policies expressed in AICRA and its implementing regulations. Under our system of government, these policy choices are made by the Legislature and implemented by the Executive. *See In the Matter of Grant of the Charter School Application of Englewood on the Palisades Charter School,* 320 *N.J.Super.* 174, 226, 727 *A.*2d 15 (App.Div.1999); *County of Camden v. Waldman,* 292 *N.J.Super.* 268, 291–92, 678 *A.*2d 1101 (App.Div.1996), *certif. denied,* 149 *N.J.* 140, 693 *A.*2d 109 (1997). We review the regulations to determine their legality, not to participate in the policy debate.

As modified with respect to *N.J.A.C.* 11:3.5.6(d)(3), we affirm the regulations.

## APPENDIX A

## SUBCHAPTER 3. BASIC AUTOMOBILE

## INSURANCE POLICY

### Authority

N.J.S.A. 17:1–8.1 and 17:1–15e and P.L.1998, c. 21.

### Source and Effective Date

R.1998 d.592, effective December 21, 1998

(operative March 22, 1999).

See: 30 N.J.R. 3209(a), 30 N.J.R. 4398(a).

**11:3–3.1  Purpose and scope**

(a) This subchapter provides rules to be utilized by insurers in developing the policy forms and rates for basic automobile insurance policies to be filed with and approved by the Department in accordance with the provisions of N.J.S.A. 39:6A–3.1.

(b) This subchapter shall apply to all insurers writing private passenger automobile insurance on personal lines policy forms, including the New Jersey Personal Automobile Insurance Plan established by N.J.A.C. 11:3–2.

**11:3–3.2  Definitions**

The following words and terms, when used in this subchapter, shall have the following meanings unless the context clearly indicates otherwise:

"Basic automobile insurance policy" or "basic policy" means that automobile insurance policy offered pursuant to N.J.S.A. 39:6A–3.1 and this subchapter.

"Commissioner" means the Commissioner of the Department of Banking and Insurance.

"Department" means the Department of Banking and Insurance.

"Insurer" means any person or persons, corporation, association, partnership, company, reciprocal exchange, or other legal entity authorized or admitted to transact private passenger automobile insurance in this State, or any one member of a group of affiliated companies that transacts business in accordance with a common rating system.

"Medically necessary" is as defined in N.J.A.C. 11:3–4.2.

"Personal injury protection" or "PIP" means the benefits and coverages set forth at N.J.S.A. 39:6A–4 and 39:6A–3.1 and N.J.A.C. 11:3–4.

"Standard automobile insurance policy" or "standard policy" means that policy form filed by private passenger automobile insurers and approved by the Commissioner that contains the coverages and options pursuant to N.J.S.A. 39:6A–4.

**11:3–3.3  General provisions**

(a) All insurers writing private passenger automobile insurance and the Personal Automobile Insurance Plan shall file for approval with the Department their rates, rules and policy forms for a basic automobile insurance policy to be issued in accordance with N.J.S.A. 39:6A–3.1 and this subchapter.

(b) An insurer shall make available the basic policy at either a single tier rate or at multiple tier rates, consistent with its tier rating system filed and approved pursuant to N.J.A.C. 11:3–19A. If more than one basic policy rate is offered, each shall be identified as part of a standard, non-standard or preferred tier.

(c) If a named insured has elected basic automobile insurance coverage and other immediate family members or resident relatives of the named insured have higher policy limits under a standard policy, the provisions of N.J.S.A. 39:6A–4.2 shall apply and the named insured shall only be entitled to the coverages provided under his or her basic policy.

(d) Basic policies shall provide the tort option provided under N.J.S.A. 39:6A–8a.

(e) Initial rates by coverage for basic policies filed in accordance with this subchapter shall demonstrate consistency with the rates in the insurer's standard policy, adjusted for reduced coverage limits.

(f) Insurers shall file for approval an initial basic policy rating system by January 20, 1999.

**11:3–3.4  Coverages;  mandatory and optional**

(a) The following coverages shall be included in all basic policies:

1.  Personal injury protection medical expense benefits coverage in an amount not to exceed $15,000 per person, per accident;  except that all medically necessary treatment of permanent or significant brain injury, spinal cord injury or disfigurement or medically necessary treatment of other permanent or significant injuries rendered at a trauma center or acute care hospital immediately following the accident and until the patient is stable, no longer requiring critical care and can be safely discharged or transferred to another facility in the judgment of the attending physician shall be covered in an amount not to exceed $250,000, including the $15,000 above.  The medical expense benefits provided herein shall be in accordance with N.J.A.C. 11:3–4; and

2.  Liability insurance coverage insuring against loss resulting from liability imposed by law for property damage sustained by any person arising out of the ownership, maintenance, operation or use of an automobile in an amount or limit of $5,000, exclusive of interest and costs, for damage to property in any one accident.

(b) Insurers shall also make available in the basic policy, at the option of the insured, liability insurance coverage for bodily injury or death in an amount or limit of $10,000, exclusive of interest and costs, on account of the injury or death of one or more persons in any one accident.

(c) Insurers may make available with the basic policy, at the option of the insured, comprehensive and collision coverage with deductibles filed and approved pursuant to N.J.A.C. 11:3–13.

(d) Basic policies shall not contain any other coverages, options, limits or deductibles other than those which are set forth in (a) through (c) above. Increased policy limits, the health insurance primary option for automobile medical expense coverage and uninsured/under-insured motorist coverages shall not be provided in basic policies.

**11:3–3.5   Election of basic automobile insurance policy coverage and reporting**

(a) No insurer shall issue a basic automobile insurance policy unless the named insured has signed a written document entitled "basic automobile insurance policy coverage selection form" set forth in N.J.A.C. 11:3–15.7.

(b) For the years 1999 through 2003, each insurer writing basic automobile insurance policies shall report the number of basic automobile insurance in-force exposures as of December 31 together with the age of the named insured and the territories in which the named insured resides on a form prescribed by the Commissioner, and filed no later than the next occurring February 15.

**11:3–3.6   Filing requirements**

(a) Insurers initially filing basic policy rating systems shall include the following:

1.   A complete set of policy forms and endorsements that provide the mandatory and optional coverages as set forth in this subchapter;

2.   Rates and rules as necessary;

3.   An actuarial memorandum that supports the rate differentials from the insurer's standard policy rates;

4.   The declaration page;

5.   The rating information form;  and

6.   The personal lines filing forms as set forth in N.J.A.C. 11:3–16.3(f) and (g).

(b) Subsequent amendments to the rating systems shall be filed pursuant to N.J.A.C. 11:3–16 and other applicable statutes and rules.

## SUBCHAPTER 4. PERSONAL INJURY

## PROTECTION BENEFITS; MEDICAL

## PROTOCOLS; DIAGNOSTIC TESTS

### Authority

N.J.S.A. 17:1–8.1, 17:1–15e, 39:6A–3.1a and 39:6A–4a.

### Source and Effective Date

R.1998 d.597, effective December 21, 1998

(operative March 22, 1999).

See: 30 N.J.R. 3211(a), 30 N.J.R. 3748(a), 30 N.J.R. 4401(a).

**11:3–4.1 Scope and purpose**

(a) This subchapter implements the provisions of N.J.S.A. 39:6A–3.1, 39:6A–4 and 39:6A–4.3 by identifying the personal injury protection medical expense benefits for which reimbursement of eligible charges will be made by automobile insurers under basic and standard policies and by motor bus insurers under medical expense benefits coverage.

(b) This subchapter applies to all insurers that issue policies of automobile insurance containing PIP coverage and policies of motor bus insurance containing medical expense benefits coverage.

(c) This subchapter shall apply to those policies that are issued or renewed on or after March 22, 1999.

**11:3–4.2 Definitions**

The following words, phrases and terms, when used in this subchapter, shall have the following meanings unless the context clearly indicates otherwise.

"Basic automobile insurance policy" or "basic policy" means those private passenger automobile insurance policies issued in accordance with N.J.S.A. 39:6A–3.1 and N.J.A.C. 11:3–3.

"Clinically supported" means that a health care provider prior to selecting, performing or ordering the administration of a treatment or diagnostic test has:

1. Personally examined the patient to ensure that the proper medical indications exist to justify ordering the treatment or test;

2. Physically examined the patient including making an assessment of any current and/or historical subjective complaints, observations, objective findings, neurologic indications, and physical tests;

3. Considered any and all previously performed tests that relate to the injury and the results and which are relevant to the proposed treatment or test; and

4. Recorded and documented these observations, positive and negative findings and conclusions on the patient's medical records.

"Decision point" means those junctures in the treatment of identified injuries where a decision must be made about the continuation or choice of further treatment. Decision point also refers to a determination to administer one of the tests listed in N.J.A.C. 11:3–4.5(b).

"Eligible charge" means the treating health care provider's usual, customary and reasonable charge or the upper limit of the medical fee schedule as found in N.J.A.C. 11:3–29.6, whichever is lower.

"Emergency care" means all medically necessary treatment of a traumatic injury or a medical condition manifesting itself by acute symptoms of sufficient severity such that absence of immediate attention could reasonably be expected to result in: death; serious impairment to bodily functions; or serious dysfunction of a bodily organ or part. Such emergency care shall include all medically necessary care immediately following an automobile accident, including, but not limited to, immediate pre-hospitalization care, transportation to a hospital or trauma center, emergency room care, surgery, critical and acute care. Emergency care extends during the period of initial hospitalization until the patient is discharged from acute care by the attending physician. Emergency care shall be presumed when medical care is initiated at a hospital within 120 hours of the accident.

"Health care provider" or "provider" means those persons licensed or certified to perform health care treatment or services compensable as medical expenses and shall include, but not be limited to:

1. A hospital or health care facility that is maintained by State or any political subdivision;

2. A hospital or health care facility licensed by the Department of Health and Senior Services;

3. Other hospitals or health care facilities designated by the Department of Health and Senior Services to provide health care services, or other facilities, including facilities for radiological and diagnostic testing, free-standing emergency clinics or offices, and private treatment centers;

4. A nonprofit voluntary visiting nurse organization providing health care services other than a hospital;

5. Hospitals or other health care facilities or treatment centers located in other States or nations;

6. Physicians licensed to practice medicine and surgery;

7. Licensed chiropractors;

8. Licensed dentists;

9. Licensed optometrists;

10. Licensed pharmacists;

11. Licensed chiropodists (podiatrists);

12. Registered bioanalytical laboratories;

13. Licensed psychologists;

14. Licensed physical therapists;

15. Certified nurse mid-wives;

16. Certified nurse practitioners/clinical nurse-specialist;

17. Licensed health maintenance organizations;

18. Licensed orthotists and prosthetists;

19. Licensed professional nurses;

20. Licensed occupational therapists;

21. Licensed speech-language pathologists;

22. Licensed audiologists;

23. Licensed physicians assistants;

24. Licensed physical therapy assistants;

25. Licensed occupational therapy assistants; and

26. Providers of other health care services or supplies, including durable medical goods.

"Identified injury" means those injuries identified by the Department in the subchapter Appendix as being suitable for medical

treatment protocols in accordance with N.J.S.A. 39:6A–3.1a and 39:6A–4a.

"Medical expense" means the reasonable and necessary expenses for treatment or services rendered by a provider, including medical, surgical, rehabilitative and diagnostic services and hospital expenses and reasonable and necessary expenses for ambulance services or other transportation, medication and other services, subject to limitations as provided for in the policy forms that are filed and approved by the Commissioner.

"Medically necessary" or "medical necessity" means that the medical treatment or diagnostic test is consistent with the clinically supported symptoms, diagnosis or indications of the injured person, and:

1. The treatment is the most appropriate level of service that is in accordance with the standards of good practice and standard professional treatment protocols including the Care Paths in the Appendix, as applicable;

2. The treatment of the injury is not primarily for the convenience of the injured person or provider; and

3. Does not include unnecessary testing or treatment.

"Non-medical expense" means charges for those:

1. Products and devices, not exclusively used for medical purposes or as durable medical equipment, such as any vehicles, durable goods, equipment, appurtenances, improvements to real or personal property, fixtures; and

2. Services and activities such as recreational activities, trips and leisure activities.

"Pre-certification" means a program, described in policy forms in compliance with these rules, by which the medical necessity of certain diagnostic tests, medical treatments and procedures are subject to prior authorization, utilization review and/or case management.

"Standard automobile insurance policy" or "standard policy" means a private passenger automobile insurance policy issued in accordance with N.J.S.A. 39:6A–4.

**11:3–4.3  Personal injury protection benefits applicable to basic and standard policies**

(a) Personal injury protection coverage shall provide reimbursement for all medically necessary expenses for the diagnosis and treatment of injuries sustained from a covered automobile accident up to the limits set forth in the policy and in accordance with this subchapter.

(b) Personal injury protection coverage shall only provide reimbursement for clinically supported necessary non-medical expenses that are prescribed by a treating medical provider for a permanent or significant brain, spinal cord or disfiguring injuries.

**11:3–4.4   Deductibles and co-pays**

(a) Each insurer shall offer a standard $250.00 deductible and 20 percent copayment on medical expense benefits payable between $250.00 and $5,000.

(b) Each insurer shall also offer, at appropriately reduced premiums, the option to select medical expense benefit deductibles of $500.00, $1,000, $2,000 and $2,500 in accordance with the following provisions:

1. Any medical expense deductible elected by the named insured shall apply only to the named insured and any resident relative in the named insured's household, who is not a named insured under another automobile policy and not to any other person eligible for personal injury protection benefits required to be provided in accordance with N.J.S.A. 39:6A–3.1 and 39:6A–4;

2. Premium credits calculated and represented as a percentage of the applicable premium shall be provided for each deductible. The premium percentage shall be uniform by filer on a statewide basis; and

3. The deductible option elected by the named insured shall continue in force as to subsequent renewal or replacement policies until the insurer or its authorized representative receives a properly executed coverage selection form to eliminate or change the deductible.

(c) All deductibles and co-pays in (a) and (b) above shall apply on a per accident basis.

(d) Notwithstanding (a) and (b) above, an insurer may offer alternative deductible and co-pay options as part of an approved pre-certification program pursuant to N.J.A.C. 11:3–4.8.

(e) For private passenger automobiles insured under a commercial automobile insurance policy where no natural person is a named insured, insurers shall only provide personal injury protec-

tion with medical expense benefits coverage in an amount not to exceed $250,000 per person, per accident, with the deductible and copayment amount set forth in (a) above.

**11:3-4.5  Diagnostic tests**

(a) The personal injury protection medical expense benefits coverage shall not provide reimbursement for the following diagnostic tests, which have been determined to yield no data of any significant value in the development, evaluation and implementation of an appropriate plan of treatment for injuries sustained in motor vehicle accidents:

1. (Reserved)
2. Spinal diagnostic ultrasound;
3. Iridology;
4. Reflexology;
5. Surrogate arm mentoring;
6. Brain mapping;
7. Surface electromyography (surface EMG);
8. (Reserved); and
9. Mandibular tracking and stimulation.

(b) The personal injury protection medical expense benefits coverage shall provide for reimbursement of the following diagnostic tests, which have been determined to have value in the evaluation of injuries, the diagnosis and development of a treatment plan for persons injured in a covered accident, when medically necessary and consistent with clinically supported findings:

1. Needle electromyography (needle EMG) when used in the evaluation and diagnosis of neuropathies and radicular syndrome where clinically supported findings reveal a loss of sensation, numbness or tingling. A needle EMG is not indicated in the evaluation of TMJ/D and is contraindicated in the presence of staph infection on the skin or cellulitis. This test should not normally be performed within 14 days of the traumatic event and should not be repeated where initial results are negative. Only one follow up exam is appropriate.

2. Somasensory evoked potential (SSEP), visual evoked potential (VEP), brain audio evoked potential (BAEP), or brain evoked potential (BEP), nerve conduction velocity (NCV) and H-reflex Study are reimbursable when used to evaluate neuropathies and/or signs of atrophy, but not within 21 days following the traumatic injury.

3. Electroencephalogram (EEG) when used to evaluate head injuries, where there are clinically supported findings of an altered level of sensorium and/or a

suspicion of seizure disorder. This test, if indicated by clinically supported findings, can be administered immediately following the insured event. When medically necessary, repeat testing is not normally conducted more than four times per year.

4. Videofluroscopy only when used in the evaluation of hypomobility syndrome and wrist/carpal hypomobility, where there are clinically supported findings of no range or aberrant range of motion or dysmmetry of facets exist. This test should not be performed within three months following the insured event and follow up tests are not normally appropriate.

5. Magnetic resonance imaging (MRI) when used in accordance with the guidelines contained in the American College of Radiology, Appropriateness Criteria to evaluate injuries in numerous parts of the body, particularly the assessment of nerve root compression and/or motor loss. MRI is not normally performed within five days of the insured event. However, clinically supported indication of neurological gross motor deficits, incontinence or acute nerve root compression with neurologic symptoms may justify MRI testing during the acute phase immediately post injury.

6. Computer assisted tomographic studies (CT, CAT Scan) when used to evaluate injuries in numerous aspects of the body. With the exception of suspected brain injuries, CAT Scan is not normally administered immediately post injury, but may become appropriate within five days of the insured event. CAT Scan is not appropriate for TMJ/D. Repeat CAT Scans should not be undertaken unless there is clinically supported indication of an adverse change in the patient's condition.

7. Dynatron/cyber station/cybex when used to evaluate muscle deterioration or atrophy. These tests should not be performed within 21 days of the insured event and should not be repeated if results are negative. Repeat tests are not appropriate at less than six months intervals.

8. Sonograms/ultrasound when used in the acute phase to evaluate the abdomen and pelvis for intra-abdominal bleeding. These tests are not normally used to assess joints (knee and elbow) because other tests are more appropriate. Where MRI is performed, sonogram/ultrasound are not necessary. These tests should not be used to evaluate TMJ/D. However, echocardiogram is appropriate in the evaluation of possible cardiac injuries when clinically supported.

(c) The terms "normal," "normally," "appropriate" and "indicated" as used above in (b), are intended to recognize that no single rule can replace the good faith educated judgment of a trained medical professional. Thus, "normal," "normally," "appropriate" and "indicated" pertain to the usual, routine, customary or common experience and conclusion, which may in unusual circumstances differ from the actual judgment or course of treatment. The unusual circumstances shall be based on clinically supported findings of a trained medical professional. The use of these terms is intended to indicate some flexibility and avoid rigidity in the

application of these rules in the decision point review required in (d) below.

(d) Except as provided in (e) below, a determination to administer any of the tests in (b) above shall be subject to decision point review pursuant to N.J.A.C. 11:3–4.7.

(e) The requirements of (b) and (d) above shall not apply to diagnostic tests administered during emergency care.

**11:3–4.6  Medical protocols**

(a) Pursuant to N.J.S.A. 39:6A–3.1 and 39:6A–4, the Commissioner designates the care paths, set forth in the subchapter Appendix incorporated herein by reference, as the standard course of medically necessary treatment, including diagnostic tests, for the identified injuries.

(b) Where the care path indicates a decision point either by a hexagon in the care path itself or by reference in the text to a second opinion, referral for a second independent consultative medical opinion, development of a treatment plan or mandatory case management, the policy shall provide for a decision point review in accordance with N.J.A.C. 11:3–4.7.

(c) Treatments that vary from the care paths shall be reimbursable only when warranted by reason of medical necessity.

(d) The care paths do not apply to treatment administered during emergency care.

**11:3–4.7  Decision point review**

(a) Insurers shall file for approval policy forms that provide a plan for the timely review of treatment of identified injuries at decision points and for the approval of the administration of the diagnostic tests in N.J.A.C. 11:3–4.5(b).

(b) The decision point review plan shall meet the following requirements:

1. The plan shall include procedures for the injured person or his or her designee to provide prior notice to the insurer or its designee together with the appropriate clinically supported findings that additional treatment or the adminis-

tration of a test in accordance with N.J.A.C. 11:3–4.5(b) is medically necessary, as follows:

    i. The prompt review of the notice and supporting materials submitted by the provider and authorization or denial of reimbursement for further treatment or tests;

    ii. The scheduling of a physical examination of the injured person in accordance with (b)2 below where the notice and supporting materials and other medical records if requested, are not sufficient to authorize or deny reimbursement of further treatment or tests; and

    iii. Any denial of reimbursement for further treatment or tests shall be based on the determination of a physician.

    2. A physical examination of the injured party as part of a decision point review shall be conducted as follows:

    i. The insurer shall notify the injured person or his or her designee that a physical examination is required;

    ii. The physical examination shall be scheduled within seven calendar days of receipt of the notice in (b)1 above unless the injured person agrees to extend the time period;

    iii. The medical examination shall be conducted by a provider in the same discipline as the treating provider;

    iv. The medical examination shall be conducted at a location reasonably convenient to the injured person;

    v. The treating provider or injured person, upon the request of the insurer, shall provide medical records and other pertinent information to the provider conducting the medical examination. The requested records shall be provided no later than the time of the examination; and

    vi. The insurer shall notify the injured person or his or her designee whether reimbursement for further treatment or tests is authorized as promptly as possible but in no case later than three days after the examination. If the examining provider prepares a written report concerning the examination, the injured person or his or her designee shall be entitled to a copy upon request.

    3. The plan may provide that failure to notify the insurer as required in the plan; failure to provide medical records; or failure to appear for the physical examination scheduled in accordance with b(2) above shall result in an additional co-payment not to exceed 50 percent of the eligible charge for medically necessary diagnostic tests, treatments, surgery, durable medical goods and non-medical expenses that are incurred after notification to the insurer is required but before authorization for continued treatment or the administration of a test is made by the insurer. No insurer may impose the additional co-payment where the insurer received the required notice but failed to act in accordance with its approved decision point plan to authorize or deny reimbursement of further treatment or tests.

    4. The plan shall avoid undue interruptions in a course of treatment.

5. Insurers are encouraged to provide decision point review plans that permit the treating provider to submit for review a comprehensive treatment plan so as to minimize the need for piecemeal review.

(c) Notwithstanding the requirements of (b) above, a pre-certification plan filed and approved pursuant to N.J.A.C. 11:3–4.8 shall satisfy the requirement to have a decision point review plan.

(d) All decision point review plans, including a pre-certification program filed and approved pursuant to N.J.A.C. 11:3–4.8 shall contain provisions for the disclosure of the procedures in the decision point review plan to injured persons and providers.

1. The information required to be disclosed pursuant to this subsection shall include a description of:

i. The financial responsibility of the injured person including co-payments and deductibles;

ii. The financial responsibility of the provider for providing treatment or administering tests without authorization from the insurer; and

iii. How authorization for treatment and the administration of tests may be obtained.

2. In addition to the description of the plan set forth in the policy form, the insurer shall provide any information necessary to comply with decision point review in accordance with this rule to the injured person, the provider, or both, promptly upon receiving notice of the claim.

(e) No decision point requirements shall apply within 10 days of the insured event. This provision should not be construed so as to require reimbursement of tests and treatment that are not medically necessary.

**11:3–4.8 Pre–certification plans**

(a) Insurers may file for approval policy forms that provide for a pre-certification of certain medical procedures, treatments, diagnostic tests, or other services, non-medical expenses and durable medical equipment by the insurer or its designated representative.

(b) No pre-certification requirements shall apply within 10 days of the insured event.

(c) Pre-certification shall be based exclusively on medical necessity and shall not encourage over or under utilization of the treatment or test.

(d) An insurer that wishes to use a pre-certification plan shall designate a licensed physician to serve as medical director for services provided to covered persons in New Jersey. The medical director shall ensure that:

1. Any utilization decision to deny reimbursement for further testing or treatment because the treatment or diagnostic tests are not medically necessary, shall be made by a physician. In the case of treatment prescribed or provided by a dentist, the decision shall be by a dentist;

2. A utilization management decision shall not retrospectively deny payment for treatment provided when prior approval has been obtained, unless the approval was based upon fraudulent information submitted by the person receiving treatment or the provider; and

3. The utilization management program shall be available, at a minimum, during normal working hours to respond to authorization requests.

(e) The insurer shall include with its filing, the information about its pre-certification plan that will be given to consumers with new and renewal policies after the pre-certification plan is approved and upon notice of a claim. The consumer information shall include at a minimum the items in N.J.A.C. 11:3–4.7(d).

(f) A pre-certification plan may include provisions that require injured persons to obtain durable medical equipment directly from the insurer or its designee.

(g) Policy forms may include an additional co-payment not to exceed 50 percent of the eligible charge for medically necessary diagnostic tests, treatments, surgery, durable medical equipment and non-medical expenses that are incurred without first complying with an approved pre-certification plan.

(h) Pre-certification plans shall avoid undue interruptions in a course of treatment.

(i) Insurers are encouraged to provide pre-certification plans that permit a treating provider to submit a comprehensive treatment plan for pre-certification so as to minimize the need for piecemeal review.

11:3–4.9 Assignment of benefits

Insurers may file for approval policy forms including reasonable procedures for, or restrictions on, the assignment of personal

injury protection benefits, consistent with the efficient administration of the coverage.

## APPENDIX

## TREATMENT OF ACCIDENTAL INJURY

## TO THE SPINE AND BACK

## CARE PATHS

### Exhibit 1

### Glossary of Terms

Acute Disease—a disease with rapid onset and short course to recovery. Not chronic.

Care Path—a recommended extensive course of care based on professionally recognized standards.

Case Management—a method of coordinating the provision of healthcare to persons injured in automobile accidents, with the goal of ensuring continuity and quality of care and cost effective outcomes. The Case Manager may be a nurse, social worker, or physician, preferably with certification in case management.

Cauda Equina—a collection of spinal roots that descend from the lower part of the spinal cord. They exist in the lower part of the vertebral canal.

Chronis Disease—a disease with long duration that changes little and progresses slowly. The apposite of acute.

Clinical Evaluation—the evaluation of the symptoms and signs of an injured person by a treating practitioner.

Conservative Therapy—treatment which is not considered aggressive; avoiding the administration of medicine or utilization of invasive procedures until such procedures are clearly indicated.

Contusion—an injury to underlying soft tissues when the skin is not broken. A bruise.

Diagnostic Evaluation—the process of differentiating between two or more diseases with similar signs and symptoms through the use of evaluative procedures such as imaging, laboratory, and physical tests.

Herniation—the protrusion or projection of an organ or other body structure through a defect or natural opening in a covering membrane, muscle, or bone.

Independent Consultative Opinion—physical examination by a physician of similar specialty to the injured person's treating practitioner to provide a second medical opinion. The independent physician may support, refute, or provide alternatives to the current diagnosis and treatment plans.

Non–Compliant—a patient who wilfully chooses not to participate in the treatment plan agreed upon by the patient and his/her healthcare provider and does not have secondary issues such as lack of transportation, pre-existing conditions or comorbidities.

PT—Physical Therapy—the therapeutic use of heat, light, water, electricity, massage, exercise, and non-ionizing radiation in treatment of injuries to the soft tissue and muscles/skeleton. PT rendered to persons injured in automobile accidents must be provided by a person whose scope of licensure includes physical therapy.

Radicular—pertaining to a root (such as a nerve root) disorder.

Radiculopathy—a disorder of a nerve root.

Sign—an objective manifestation, usually indicative of a disease or disorder. Signs can be observed by the clinician, as opposed to symptoms, which are perceived only by the affected individual.

Soft Tissue Injury—injuries sustained to the muscle, skin, connective tissue.

Spine—the vertebral column.

Spinal Shock—an acute condition resulting from spinal cord severance. Characterized by a total sensory loss and loss of reflexes below the level of injury and flaccid paralysis.

Sprain—an injury at a joint where a ligament is stretched or torn.

Strain—an injury caused by the over-stretching or tearing of a muscle or tendon. In its most severe form, the muscle ruptures.

Symptom—a subjective manifestation, usually indicative of a disease or disorder. Symptoms are experienced only by the affected individual, as opposed to signs, which can be observed by others.

Treatment Plan—specific medical, surgical, chiropractic, acupuncture, or psychiatric procedures used to improve the signs or symptoms associated with injures sustained in automobile accidents, e.g., physical therapy, surgery, administration of medications, etc.

EXHIBIT 2

# TREATMENT OF ACCIDENTAL INJURY TO THE SPINE AND BACK CARE PATH OVERVIEW

The following flow charts address the three anatomical areas of spinal injuries; Care Paths 1 through 6 have been developed for the conditions noted in the shaded boxes.

EXHIBIT 3

## CARE PATH 1

**CERVICAL SPINE SOFT TISSUE INJURY**
(STRAIN/SPRAIN/CONTUSION WHIPLASH) OF THE NECK

**CONSERVATIVE THERAPY**
(up to 4 weeks)

- Provider office visits (up to 5)
- Medications[1]
- Consider soft neck collar (maximum 48 hours)
- Increasing exercise
- Consider PT program (2-3 times per week, up to 4 weeks)[2]
- Spinal manipulation[3] (1-3 visits per week, up to 4 weeks)

(The total number of visits for physical therapy and spinal manipulation should not exceed 12.)

**Development of Radiculopathy?**

YES → Go to Care Path 2 Cervical Herniated Disc/Radiculopathy

NO

**4 WEEKS POST INJURY**

Improvement in symptoms based on objective findings?

NO

YES → Symptoms Minimally Resolved → Patient Compliant with Treatment Plan? → YES → Diagnostic Re-evaluation

May include:
- CBC
- ESR
- X-ray, CT, MRI (if not previously done)
- Bone scan

NO → Continue Conservative Therapy
- Consider Specialist Referral
- Consider Psychosocial Evaluation[4]
- Consider PT if no prior PT

Symptoms Resolved → Discharge From Care

1, 2, 3, 4  See Addendum to Care Paths

ICD-9 CODES
728 0
728.85
739.0
739.1
847.0
847 9
922.3
922.31
953.0

4 See Addendum to Care Paths

**CARE PATH 1**

EXHIBIT 4

CARE PATH 2

ICD-9 CODES

722.0
722.2
722.70
722.71
728.0
739.0
953 0

CARE PATH 2

EXHIBIT 5

CARE PATH 3

THORACIC SPINE
SOFT TISSUE INJURY
(STRAIN/SPRAIN/CONTUSION)
OF THE UPPER BACK

NOTE: These Care Paths identify typical courses of intervention. There may be patients who require more or less treatment. However, cases that deviate from the Care Paths may be subject to more careful scrutiny and may require documentation of the special circumstances. Treatments must be based on patient need and professional judgment. Deviations may be justified by individual circumstances, such as pre-existing conditions and/or consequences. The Care Paths are only intended for and when the injury was caused by a motor vehicle accident (MVA). If at any point at the decision making process the healthcare provider finds that the injury was not caused by a MVA, the provider must contact the patient's PIP carrier and mapped insurance carrier.

**CONSERVATIVE THERAPY**
(up to 4 weeks)

- Provider office visits (up to 6)
- Medication[1]
- Bed rest (maximum 2-4 days)
- Increasing exercise
- Consider PT program (2-3 times a week for 2-4 weeks)[3]
- Spinal manipulation[3] (1-3 visits per week, up to 4 weeks)

(The total number of visits for physical therapy and spinal manipulation should not exceed 12.)

4 WEEKS POST INJURY

Improvement in symptoms based on objective findings?

YES — NO

**YES:**

Symptoms Resolved

Symptoms Minimally Resolved

Discharge from Care

Patient Compliant with Treatment Plan?

NO — YES

**Continue Conservative Therapy**
- Begin or continue PT
- Consider Specialist Referral
- Consider Psychosocial Evaluation[4]

**Continue Conservative Therapy**
- Begin or continue PT
- Consider Specialist Referral
- Pain Management up to 3 visits (may include acupuncture)

**NO (right branch):**

Symptoms Worse or Unresolved

Development of Radiculopathy?

NO — YES

YES: Go to Care Path 4 Thoracic Spine Herniated Disc/ Radiculopathy

NO: **Diagnostic Re-evaluation**

May include:
- CBC
- ESR
- X-ray AP & Lateral
- Bone scan

1, 2, 3, 4  See Addendum to Care Paths

ICD-9 CODES

728 0
728 85
739 0
739 7
739 8
847 1
847 9
922 3
922 33
953 2

**CARE PATH 3**

< See Addendum to Care Paths

EXHIBIT 6

CARE PATH 4

THORACIC SPINE
(UPPER BACK INJURY)
HERNIATED DISC/RADICULOPATHY

HERNIATED DISC
with or without
RADICULAR SYMPTOMS

SOFT TISSUE INJURY
STRAIN/SPRAIN/CONTUSION
with RADICULOPATHY

HERNIATED DISC with
RADICULOPATHY and SEVERE
NEUROLOGICAL COMPRESSION
or COMPROMISE

Conservative Therapy
(up to 4 weeks)
Includes:
- Provider office visits (up to 8)
- Medications[1]
- Bed rest (maximum 2 - 4 days)
- Increasing exercise
- Consider PT program (2-3 times per week for
2 - 4 weeks)[3]

Referral to Neurology,
Physiatry, Neurosurgery, or
Orthopedic Surgery

Diagnostic Evaluation
(if not conducted previously)
- MRI
- CT
- Myelography
- Discogram

Test
Result (-)
◆ Go To
Conservative
Therapy

Test
Result (+)

DISC SURGERY

Progressive
Neurologic
Deficit?

YES

NO

Post-Surgical PT
2-3x wk for 4-8 weeks

Improved
within 8
weeks?

NO

YES

4 WEEKS   POST INJURY

Improvement in
symptoms
based on
objective
findings?

Continue PT

Discharge
from Care

YES

NO

Improved
within 16
weeks?

Continue
Conservative
Therapy

Diagnostic Evaluation
May include:
- EMG (if the diagnosis of
radiculopathy is obvious
& specific on clinical
examination, EMG testing
is not recommended)
- SEP
- MRI or CT

1, 3 See Addendum to Care Paths

NO

YES

**CARE PATH 4**

ICD-9 CODES

722.0   722.70
722.1   722.72
722.2   726.0
722.11   739.0

EXHIBIT 7

## CARE PATH 5

NOTE: These Care Paths identify typical courses of intervention. There may be patients who require more or less treatment. However cases that deviate from the Care Paths may be subject to more careful scrutiny and may require documentation of the special circumstances. Treatments must be based on patient need and professional judgment. Decisions may be justified by individual circumstances, such as pre-existing conditions and/or comorbidities. The Care Paths are only intended for use when the injury was caused by a motor vehicle accident (MVA). If at any point in the decision making process the healthcare provider finds evidence that the injury was not caused by a MVA, the provider must contact the patient's PIP carrier and medical insurance carrier.

**LUMBAR-SACRAL SPINE SOFT TISSUE INJURY (STRAIN/SPRAIN/CONTUSION) OF THE LOW BACK**

**CONSERVATIVE THERAPY (up to 6 weeks)**

- Provider office visits (up to 5)
- Medications[1]
- Bed rest (maximum 2-4 days)
- Increasing exercise
- Consider PT program (2-3 times per week for 2-4 weeks)[2]
- Spinal manipulation[3] (1-3 visits per week, up to 4 weeks)

(The total number of visits for physical therapy and spinal manipulation should not exceed 12.)

**4 WEEKS POST INJURY**

Improvement in symptoms based on objective findings?

**YES**

Symptoms Resolved

Symptoms Minimally Resolved

Discharge from Care

Patient Compliant with Treatment Plan?

**NO** — Continue Conservative Therapy
- Begin or continue PT
- Consider Specialist Referral
- Consider Psychosocial Evaluation[4]

**YES** — Continue Conservative Therapy
- Begin or continue PT
- Consider Specialist Referral
- Pain Management up to 3 visits (may include acupuncture)

**NO**

Symptoms Worse or Unresolved

Development of Radiculopathy?

**NO**

**YES** — Go to Care Path 6 Lumbar-Sacral Spine Herniated Disc/Radiculopathy

Diagnostic Re-evaluation

May include:
- CBC
- ESR
- X-ray AP & Lateral
- Bone scan

1, 2, 3, 4  See Addendum to Care Paths

ICD-9 CODES

| | |
|---|---|
| 728 0 | 846 8 |
| 728.85 | 846 9 |
| 739.0 | 847.2 |
| 739.3 | 847.3 |
| 739 4 | 847.4 |
| 846 | 847 9 |
| 846 0 | 922 3 |
| 846.1 | 922 31 |
| 846.2 | 953 2 |
| 846 3 | 953.3 |

**CARE PATH 5**

4. See Addendum to Care Paths

EXHIBIT 8

CARE PATH 6

LUMBAR-SACRAL SPINE
(LOW BACK INJURY)
HERNIATED DISC/RADICULOPATHY

CARE PATH 6

EXHIBIT 9

TREATMENT OF ACCIDENTAL INJURY
TO THE SPINE AND BACK

CARE PATH
DIAGNOSIS CODING

The following International Classification of Diseases, 9th Revision Clinical Modification—fifth edition ICD–9–CM diagnostic codes are associated with Care Path 1 through Care Path 6 for treatment of Accidental Injury to the Spine and Back and are included on each appropriate Care Path. The ICD9 codes referenced do not include codes for multiple diagnoses or co-morbidity.

| | | |
|---|---|---|
| Care Path | 728.0 | Disorders of muscle, ligament and fascia |
| 1 | 728.85 | Spasm of muscle |
| | 739.0 | Non allopathic lesions—not elsewhere classified |
| | 739.1 | Somatic dysfunction of cervical region |
| | 847.0 | Sprains and strains of neck |
| | 847.9 | Sprains and strains of back, unspecified site |
| | 922.3 | Contusion of back |
| | 922.31 | Contusion of back, excludes interscapular region |
| | 953.0 | Injury to cervical root |
| | | |
| Care Path | 722.0 | Displacement of cervical intervertebral disc without myelopathy |
| 2 | 722.2 | Displacement of intervertebral disc, site unspecified, without myelopathy |
| | 722.70 | Intervertebral disc disorder with myelopathy, unspecified region |
| | 722.71 | Intervertebral disc disorder with myelopathy, cervical region |
| | 728.0 | Disorders of muscle, ligament and fascia |
| | 739.0 | Non allopathic lesions—not elsewhere classified |
| | 953.0 | Injury to cervical root |

Care Path 3

| | | |
|---|---|---|
| 728.0 | Disorders of muscle, ligament and fascia |
| 728.85 | Spasm of muscle |
| 739.0 | Non allopathic lesions—not elsewhere classified |
| 739.2 | Somatic dysfunction of thoracic region |
| 739.8 | Somatic dysfunction of rib cage |
| 847.1 | Sprains and strains, thoracic |
| 847.9 | Sprains and strains of back, unspecified site |
| 922.3 | Contusion of back |
| 922.33 | Contusion of back, interscapular region |

Care Path 4

| | |
|---|---|
| 722.0 | Displacement of cervical intervertebral disc without myelopathy |
| 722.1 | Displacement of thoracic or lumbar intervertebral disc without myelopathy |
| 722.11 | Displacement of thoracic intervertebral disc without myelopathy |
| 722.2 | Displacement of intervertebral disc, site unspecified, without myelopathy |
| 722.70 | Intervertebral disc disorder with myelopathy, unspecified region |
| 722.72 | Intervertebral disc disorder with myelopathy, thoracic region |
| 728.0 | Disorders of muscle, ligament and fascia |
| 739.0 | Non allopathic lesions—not elsewhere classified |

Care Path 5

| | |
|---|---|
| 728.0 | Disorders of muscle, ligament and fascia |
| 728.85 | Spasm of muscle |
| 739.0 | Non allopathic lesions—not elsewhere classified |
| 739.3 | Somatic dysfunction of lumbar region |
| 739.4 | Somatic dysfunction of sacral region |
| 846 | Sprains and strains of sacroiliac region |
| 846.0 | Sprains and strains of lumbosacral (joint) (ligament) |
| 846.1 | Sprains and strains of sacroiliac ligament |
| 846.2 | Sprains and strains of sacrospinatus (ligament) |
| 846.3 | Sprains and strains of sacrotuberous (ligament) |

| | | |
|---|---|---|
| | 846.8 | Sprains and strains of other specified sites of sacroiliac region |
| | 846.9 | Sprains and strains, unspecified site of sacroiliac region |
| | 847.2 | Sprains and strains, lumbar |
| | 847.3 | Sprains and strains, sacrum |
| | 847.4 | Sprains and strains, coccyx |
| | 847.9 | Sprains and strains, unspecified site of back |
| | 922.3 | Contusion of back |
| | 922.31 | Contusion of back, excludes interscapular region |
| | 953.2 | Injury to lumbar root |
| | 953.3 | Injury to sacral root |
| Care Path | 722.1 | Displacement of thoracic or lumbar intervertebral disc without myelopathy |
| 6 | 722.10 | Displacement of lumbar intervertebral disc without myelopathy |
| | 722.2 | Displacement of intervertebral disc, site unspecified, without myelopathy |
| | 722.70 | Intervertebral disc disorder with myelopathy, unspecified region |
| | 722.73 | Intervertebral disc disorder with myelopathy, lumbar region |
| | 728.0 | Disorders of muscle, ligament and fascia |
| | 739.0 | Non allopathic lesions—not elsewhere classified |
| | 953.3 | Injury to sacral root |

The following ICD–9–CM supplemental classification of external causes of injury may be used *in addition* to the specific diagnostic codes noted above and on each Care Path:

• E 810 through E 819, selected E 820 series codes. These codes may be used to indicate cause of injury as motor vehicle accident but should not be used without an associated diagnostic code.

EXHIBIT 10

ADDENDUM TO CARE PATHS

1. Medications
   Muscle Relaxants
   - Muscle relaxants are an option in the treatment of patients with acute neck, thoracic, and low back problems. While probably more effective than placebo, muscle relaxants have not been shown to be more effective than NSAIDs.
   - No additional benefit is gained by using muscle relaxants in combination with NSAIDs over using NSAIDs alone.
   - Muscle relaxants have potential side effects in 30 percent of patients. When considering the option of using relaxants, the clinician should balance the potential patient's intolerance of other agents.
   Opioid Analgesics
   - When used for a time-limited course, opioid analgesics are an option in the management of patients with acute neck, thoracic, and low back problems. The decision to use opioids should be guided by consideration of their potential complications relative to other options.
   - Opioids appear to be more effective in relieving neck, thoracic, and low back symptoms than safer analgesics, such as acetaminophen or aspirin or other NSAIDs.
   - Clinicians should be aware of the side effects of opioids, such as decreased reaction time, clouded judgment, and drowsiness, which lead to early discontinuation by as many as 35 percent of patients.
   - Patients should be warned about dependence and the danger of opioids while operating heavy machinery.
   Oral Steroids
   - Oral steroids are not recommended for the treatment of acute neck, thoracic, or low back problems.
   - A potential for severe side effects is associated with the extended use of oral steroids or steroids in high doses.
2. Who May Perform Spinal Manipulation:
   Spinal manipulation may be performed by those providers licensed or certified to perform this procedure within their scope of practice.

3.  Spinal Manipulation

    Manipulation is most helpful for patients with acute neck, thoracic, and low back problems without radiculopathy when used within the first month of symptoms.

    A trial of manipulation in patients without radiculopathy with symptoms longer than a month is probably safe, but efficacy is unproven.

    If manipulation has not resulted in symptomatic improvement that allows increased function after 1 month of treatment, the patient should be reevaluated.

    When findings suggest progressive or severe neurologic deficits, an appropriate diagnostic assessment to rule out serious neurologic conditions is indicated before beginning manipulation therapy.

    There is insufficient evidence to recommend manipulation for patients with radiculopathy.

4.  Mental Health/Rehabilitation Assessment Option If Patient Has Not Responded To Treatment

    A mental health/rehabilitation assessment can be obtained if psychological/psychosocial or psychiatric distress is obvious from the history, i.e., presence of "non-organic" physical signs, repetitive back injuries, failed previous treatments, litigation or disability compensation claims, family or financial problems, apparent secondary gain, boredom and dissatisfaction with job, frequent bouts of pain, depression, alcohol and substance abuse, extreme obesity, and apparent psychiatric behavior.

## SUBCHAPTER 5. PERSONAL INJURY

## PROTECTION DISPUTE RESOLUTION

### Authority

N.J.S.A. 17:1–8.1 and 17:1–15e, 39:6A–1.2, 39:6A–5.1 and 5.2.

### Source and Effective Date

R.1998 d.593, effective December 21, 1998.

See: 30 N.J.R. 3359(a), 30 N.J.R. 4437(a).

**11:3–5.1 Purpose and scope**

(a) The purpose of this subchapter is to establish procedures for the resolution of disputes concerning the payment of medical expense and other benefits provided by the personal injury protection coverage in policies of automobile insurance. This subchapter implements N.J.S.A. 39:6A–5.1 and 5.2, which provide that PIP disputes shall be resolved by binding alternate dispute resolution as provided in the policy form approved by the Commissioner. This subchapter also implements provisions of N.J.S.A. 2A:23A–1 et seq., as applicable to PIP dispute resolution.

(b) This subchapter shall apply to disputes arising under policies of private passenger automobile insurance, on either a personal lines or commercial lines policy form, that provide medical expense benefits and other benefits under personal injury protection coverage, as follows:

1. PIP benefits under a standard automobile insurance policy pursuant to N.J.S.A. 39:6A–4;

2. PIP benefits under a basic automobile insurance policy pursuant to N.J.S.A. 39:6A–3.1;

3. PIP benefits provided by the UCJF pursuant to N.J.S.A. 39:6–86.1; and

4. Additional PIP benefits provided pursuant to N.J.S.A. 39:6A–10.

(c) This subchapter shall apply to policies issued or renewed on or after March 22, 1999 in accordance with the approved policy terms.

**11:3–5.2  Definitions**

The following words and terms, when used in this subchapter, shall have the following meanings unless the context clearly indicates otherwise:

"Administrator" means the dispute resolution organization designated by the Commissioner pursuant to N.J.S.A. 39:6A–5.1 and N.J.A.C. 11:3–5.3.

"Basic policy" means an automobile insurance policy issued pursuant to N.J.S.A. 39:6A–3.1 and N.J.A.C. 11:3–3.

"Commissioner" means the Commissioner of the New Jersey Department of Banking and Insurance.

"Control" or "controlled" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control shall be presumed to exist if any person, directly or indirectly, owns, controls, holds the power to vote, or holds proxies representing, 10 percent or more of the voting securities of any other person, provided that no such presumption of control shall of itself relieve any person so presumed to have control from any requirement of P.L.1970, c. 22 (N.J.S.A. 17:27A–1 et seq.). This presumption may be rebutted by a showing made in the manner provided by N.J.S.A. 17:27A–3j that control does not exist in fact. The Commissioner may determine, after furnishing all persons in interest notice and an opportunity to be heard, and making specific findings of fact to support such determination, that control exists in fact, notwithstanding the absence of a presumption to that effect.

"Department" means the New Jersey Department of Banking and Insurance.

"Dispute resolution organization" or "DRO" means an organization that meets the standards set forth in N.J.S.A. 39:6A–5.1 and N.J.A.C. 11:3–5.4.

"Dispute resolution professional" or "DRP" means a natural person who meets the standards set forth in N.J.A.C. 11:3-5.5

"Medical review organization" or "MRO" means an organization of health care professionals who are licensed in New Jersey, which is certified by the Commissioner to engage in unbiased medical review of the medical care provided to persons injured in automobile accidents in accordance with N.J.S.A. 39:6A-5.2 and this subchapter. The term includes either;

1. Any peer review organization with which the Federal Health Care Financing Administration or the State contracts for medical review of Medicare or medical assistance services; or

2. Any independent health care review company.

"Personal Automobile Insurance Plan" or "PAIP" means the personal lines automobile insurance residual market mechanism established pursuant to N.J.S.A. 17:29D-1 by N.J.A.C. 11:3-2.

"Personal injury protection" or "PIP" means the coverage provided by a policy of automobile insurance pursuant to N.J.S.A. 39:6A-3.1 or 39:6A-4.

"PIP dispute" includes, but is not limited to, matters concerning:

1. Interpretation of the insurance contract's PIP provisions;

2. Whether the medical treatment or diagnostic tests are in accordance with the provisions of applicable statutes and rules for the basic and standard policies and in compliance with the terms of the policy;

3. Eligibility of the treatment or service for compensation or reimbursement, including whether the injury is causally related to the accident and the application of deductible and copayment provisions;

4. Eligibility of the provider performing the service to be compensated or reimbursed under the terms of the policy and the provisions of N.J.A.C. 11:3-4, and including whether the provider is licensed or certified to perform the treatment or service;

5. Whether the treatment was actually performed;

6. Whether the diagnostic tests performed are recognized by the Professional Boards in the Division of Consumer Affairs, Department of Law and Public Safety, administered in accordance with their standards, and approved by the Commissioner at N.J.A.C. 11:3-4;

7. The necessity and appropriateness of consultation with other health care providers;

8. Disputes involving the application of, or adherence to, the automobile insurance medical fee schedule at N.J.A.C. 11:3-29;

9. Whether the treatment or service is reasonable, necessary and in accordance with medical protocols adopted by the Commissioner at N.J.A.C. 11:3-4; or

10. Amounts claimed for PIP income continuation benefits, essential services benefits, death benefits and funeral expense benefits.

"Provider" or "health care provider" is as defined at N.J.A.C. 11:3-4.2.

"Standard policy" means an automobile insurance policy including PIP coverage as provided in N.J.S.A. 39:6A-4.

"UCJF" means the Unsatisfied Claim and Judgement Fund created pursuant to N.J.S.A. 39:6-61 et seq.

**11:3-5.3 Designation of the administrator**

(a) The Commissioner shall designate a dispute resolution organization as the administrator of the PIP alternate dispute resolution system by entering into a contract with a dispute resolution organization.

(b) The contract designating the administrator shall be for a term not to exceed five years, but may be extended according to its terms until a new administrator is designated and substituted. Nothing in this subsection shall prohibit an administrator from succeeding itself, if so designated in accordance with N.J.S.A. 39:6A-5.1 and this subchapter. The contract may provide for adjustments in the price paid for services performed over the life of the contract.

(c) The Commissioner shall request competitive proposals from among qualified dispute resolution organizations interested in serving as administrator.

(d) Dispute resolution organizations shall submit the following documents and information in connection with their proposal to serve as administrator:

1. A dispute resolution plan that describes how the organization shall meet the requirements of the Act and these rules, which shall include procedures and rules governing the dispute resolution process to ensure adherence to the standards of performance set forth in N.J.S.A. 39:6A-5.1 and 5.2 and this subchapter;

2. A description of the organization and biographical information about the key personnel that shall be responsible for executing the duties of the administrator;

3. A description of the management information systems that shall be utilized by the organization;

4. A draft budget for at least the first two years;

5. A cost proposal, which shall provide for the payment of the administrator's expenses, including the cost of dispute resolution professionals, from fees generated from the users of the system;

6. Such other information as may be provided by law, and that the Commissioner or the Treasurer may request in order to understand and evaluate the applicant's proposal.

### 11:3–5.4 Dispute resolution organizations

(a) In order to be eligible for designation as administrator, a dispute resolution organization shall meet the following criteria:

1. The dispute resolution organization shall not be owned or controlled by an insurer or affiliate of an insurer;

2. The dispute resolution organization shall utilize full-time dispute resolution professionals that meet the standards set forth in N.J.A.C. 11:3–5.5. For the purpose of this paragraph, "full-time" shall be construed to include persons who work fewer than five days per week, but who do not engage in other, conflicting employment;

3. The dispute resolution organization shall utilize an advisory council composed of parties who are users of the dispute resolution mechanism in connection with the selection of dispute resolution professionals and the periodic review of the organization's rules and processes;

4. The dispute resolution organization shall utilize procedures to avoid conflicts of interests as prohibited at N.J.A.C. 11:3–5.12;

5. The dispute resolution organization shall arrange for proceedings in locations reasonably convenient to the parties;

6. The dispute resolution organization shall maintain published rules for the conduct of the proceedings, and shall make them available to the parties and the public upon request;

7. The dispute resolution organization shall perform its functions in a prompt and efficient manner, giving due regard to the nature of the proceeding and the need for special attention when required by the exigencies of a particular matter; and

8. The dispute resolution organization shall provide sufficient oversight and training of its dispute resolution professionals so as to promote fair, efficient and consistent determinations consistent with substantive law and with rules adopted by the Commissioner.

(b) The dispute resolution organization shall develop and maintain a dispute resolution plan approved by the Commissioner that

sets forth its procedures and rules. The dispute resolution plan shall be reviewed at least annually and revisions made upon approval by the Commissioner. The plan shall include the following elements:

1. The plan shall provide that PIP dispute resolution be initiated by written notice to the administrator and to all other parties of the party's demand for dispute resolution, which notice shall set forth concisely the claims, and where appropriate the defenses, in dispute and the relief sought. The notice shall include such other information as may be required for administrative purposes;

2. The plan shall provide for consolidation of claims into a single proceeding where appropriate in order to promote prompt, efficient resolution of PIP disputes consistent with fairness and due process of law;

3. The plan shall provide the assigned dispute resolution professional with sufficient authority to provide all relief and to determine all claims arising under PIP coverage, but may provide for limited, procedural or emergent matters to be determined by one or more specially designated dispute resolution professionals;

4. The plan shall provide for the assignment of a medical review organization to review the case and report its determination when requested pursuant to N.J.S.A. 39:6A–5.2 and this subchapter;

5. The plan shall provide for the prompt, fair and efficient resolution of PIP disputes, after a hearing by the assigned dispute resolution professional, but shall also provide that alternate procedures may be utilized when appropriate, which may include mediation, conferences to promote consensual resolution and expedited hearings upon receipt of a medical review organization report, consistent with principles of substantive law and rules adopted by the Commissioner; and

6. The plan shall provide for the fair and efficient conduct of adversarial hearings when other methods of dispute resolution are either unsuccessful or inappropriate, consistent with traditional notions of due process and fundamental fairness. It shall address, at least, the following procedural issues;

    i.   Discovery;

    ii.   Receipt of evidence by the dispute resolution professional;

    iii.   Submission of briefs or memoranda of law and fact;

    iv.   Provision for decisions without testimony on consent of parties;

    v.   Notice and place of hearing;

    vi.   Methods to request adjournments;

    vii.   Presentation of testimony and evidence at a hearing; and

    viii.   Supplementation of the record.

(c) If consistent with its dispute resolution plan, a dispute resolution organization may utilize one or more dispute resolution professionals specifically to handle preliminary matters on actions including motions to disqualify an appointed DRP.

#### 11:3–5.5 Dispute resolution professionals

(a) A dispute resolution professional employed by the dispute resolution organization shall be either:

1. An attorney licensed to practice in New Jersey with at least 10 years' experience in cases involving personal injury or workers' compensation;

2. A former judge of the Superior Court or the Workers' Compensation Court, or a former Administrative Law Judge; or

3. Any other person, qualified by education and at least 10 years' experience, with sufficient understanding of automobile insurance claims and practices, contract law, and judicial or alternate dispute resolution practices and procedures.

(b) Dispute resolution professionals shall avoid conflicts of interest as prohibited at N.J.A.C. 11:3–5.12 in any matter assigned to them for determination.

1. Dispute resolution professionals shall complete and file with the dispute resolution organization a conflict of interest questionnaire that shall provide sufficient detail about financial interests of themselves and their immediate family so as to avoid any assignment to a particular case where there is a conflict of interest. Conflict of interest questionnaires shall remain confidential with the dispute resolution organization, and the information set forth therein shall only be disclosed as necessary to individuals responsible for assigning cases to dispute resolution professionals, or reviewing motions to disqualify an assigned dispute resolution professional.

2. If during the course of an assignment a dispute resolution professional determines that he or she has conflict of interest, based upon facts determined in the course of the proceedings, then the DRP shall promptly advise the administrator of the circumstances, who shall assign another DRP.

3. A party may challenge the assignment of a particular DRP by submitting the specific grounds for challenge in accordance with the rules of the dispute resolution organization approved by the Commissioner.

(c) Dispute resolution professionals shall be compensated by the administrator in accordance with the terms of the contract designating the administrator. Compensation shall not be contingent in any way upon the decision or determination of the DRP.

(d) Dispute resolution professionals shall create and maintain such records as may be necessary to carry out their responsibilities and provide such records to the administrator as required in the contract designating the administrator.

#### 11:3–5.6 Conduct of PIP dispute resolution proceedings

(a) A request for dispute resolution of a PIP dispute may be made by the injured party, the insured, a provider who is an assignee of PIP benefits or the insurer, in accordance with the terms of the policy as approved by the Commissioner. The request for dispute resolution may include a request for review by a medical review organization. The request shall be made to the administrator and copies sent to other parties.

(b) Upon receipt of the request, the administrator shall promptly assign the matter to dispute resolution professional. The administrator shall notify all parties of the DRP assigned.

(c) If the request for dispute resolution includes a request for review by a medical review organization, the administrator shall refer the matter to a certified medical review organization contemporaneously with the assignment of the DRP, and shall notify the parties and the DRP that the matter has been referred. If the initial request does not include a request for review by a medical review organization, then a request for such review may be made by any party to the assigned DRP. The DRP may refer a matter to a MRO on his or her own initiative upon a finding that the dispute concerns the diagnosis, medical necessity of treatment or diagnostic test administered to the injured person, whether the injury is causally related to the accident or is the product of a preexisting condition, or the protocols utilized by a provider. Whenever a DRP receives or initiates a request for MRO review, he or she shall transmit it to the administrator for referral who shall refer the matter to a certified MRO and notify the parties that the matter has been referred.

1. The administrator shall refer cases on a random or rotating basis to an MRO that does not have a conflict of interest, in accordance with the administrator's dispute resolution plan. Referrals shall be made in such a manner so as not to disclose the medical reviewer the identity of the insurer, nor to disclose to the insurer the identity of the medical reviewer.

2. Upon request of the MRO, a provider whose services are the subject of review shall promptly furnish a written report of the history, condition, treatment dates and results of diagnostic tests performed, and shall produce and permit the copying and inspection of all records relating to the history, treatment and condition of the injured person, and shall submit all necessary documentation as

requested. Upon request of the MRO through the administrator, the insurer shall submit any and all documentation concerning its review of the treatment and testing of the injured person, and any reports by its reviewing provider why reimbursement for the treatment, test or item of durable medical equipment was denied.

3. The MRO may request an injured person to submit to a mental or physical examination by an independent provider in the same discipline as the treating providers who is not affiliated with either the treating provider, the insurer or the MRO health care provider performing the review. Any such examination shall be conducted in a place reasonably convenient to the injured person. The MRO shall make available to the examining provider any pertinent medical records.

4. If at any time the MRO determines that it has a conflict of interest in performing a particular review, it shall notify the administrator which shall refer the case to another MRO.

i. Under such circumstances, the first-assigned MRO shall transmit to the newly assigned MRO such documents from the treating provider and the insurer as it has accumulated on the case, as may be directed by the administrator.

ii. The first-assigned MRO shall not be entitled to any reimbursement for work performed on the transferred case.

(d) Determinations by the dispute resolution professional shall be in writing and shall state the issues in dispute, the DRP's findings and legal conclusions based on the record of the proceedings and the determination of the medical review organization, if any. The findings and conclusions shall be made in accordance with applicable principles of substantive law, the provisions of the policy and the Department's rules. The award shall set forth a decision on all issues submitted by the parties for resolution.

1. If the DRP finds that the determination of a medical review organization is overcome by a preponderance of the evidence, the reasons supporting that finding shall be set forth in the written determination.

2. The award shall apportion the costs of the proceedings, regardless of who initiated the proceedings, in a reasonable and equitable manner consistent with the resolution of the issues in dispute.

3. The award may include attorney's fees for a successful claimant or respondent in an amount consonant with the award and with Rule 1.5 of the Supreme Court's Rules of Professional Conduct.

(e) The award shall be signed by the dispute resolution professional. The original shall be filed with the administrator, and copies provided to each party. If the award requires payment by the insurer for a treatment or test, payment shall be made,

together with any accrued interest pursuant to N.J.S.A. 39:6A–5, within 20 days of receipt of a copy of the determination.

(f) The final determination of the dispute resolution professional shall be binding upon the parties, but subject to vacation, modification or correction by the Superior Court in an action filed pursuant to N.J.S.A. 2A:23A–13 for review of the award.

**11:3–5.7  Recordkeeping**

(a) The administrator shall maintain records of all determinations for a period of five years.

(b) The administrator shall file a copy of each determination, except consent determinations, with the Department in either hard copy or electronic form, as provided in the contract designating the administrator.

1. Any determination filed with the Department shall be indexed and coded so as to facilitate retrieval.

2. The name of any injured party, except when appearing in the caption of the matter or used as identification of the particular case, shall be redacted in the copy filed with the Department so as to protect the privacy of the injured person.

(c) The administrator shall keep such other records as may be required by the Commissioner and as set forth in the contract designating the administrator.

**11:3–5.8  Medical review organizations**

(a) Medical review organizations shall be authorized to determine in connection with the PIP dispute resolution process set forth in this subchapter:

1. Whether the medical treatment or diagnostic test is medically necessary;

2. Whether the treatment is in accordance with medically recognized standard protocols including those protocols approved by the Commissioner and set forth in N.J.A.C. 11:3–4;

3. Whether the treatment is consistent with symptoms or diagnosis of the injury;

4. Whether the injury is causally related to the accident;

5. Whether the treatment is of a palliative rather than a restorative nature; and

6. Whether medical procedures and tests that have been repeated are medically necessary.

(b) The findings of a medical review organization shall be presumed to be correct, but may be rebutted by a preponderance of the evidence submitted to the dispute resolution professional.

**11:3–5.9  Standards for medical review organizations**

(a) Medical review organizations shall be capable of performing medical reviews for all primary specialties and disciplines.

(b) Medical review organizations shall employ a medical director to actively participate in the review of cases to assure quality and consistency.

(c) Medical review organizations shall utilize health care providers in the same discipline as the treating provider to perform the reviews who meet the following standards:

1. Reviewing health care providers shall be active practitioners who obtain a minimum of one-half of their income from practice in their area of specialty;

2. Reviewing health care providers shall be licensed in New Jersey and board certified in their specialty;

3. Reviewing health care providers shall have at least two years' experience in medical review, or be certified as a medical review physician; and

4. Reviewing health care providers shall have completed an orientation with the MRO, including medical review instruction and report writing.

(d) A medical review organization shall have adequate procedures in place to assure confidentiality of patient records.

1. All MRO files shall be indexed and referred to by reference number rather than patient name.

2. Medical files shall be maintained in a secure area of the MRO's offices.

3. Only the MRO shall request additional documents relating to the injured person's medical condition, or direct that the injured person be physically examined.

(e) A medical review organization shall utilize procedures to provide for the fair and open exchange of information and records related to the review between the treating health care provider, any provider that has reviewed the case on behalf of the insurer, and the MRO's reviewing health care provider.

(f) A medical review organization shall complete its review and submit its report to the dispute resolution professional in accordance with the medical exigencies of the case, but in no event in

excess of 20 business days from receipt of medical records from the treating health care provider.

(g) A medical review organization shall have a procedure for obtaining mental or physical examinations of injured persons that may be required in the course of its review.

(h) A medical review organization shall utilize written review procedures. In reaching its determinations, the MRO shall consider all information submitted by the parties and information deemed appropriate by the MRO, including: pertinent medical records, consulting physician reports and other documents submitted by the parties; applicable commonly accepted protocols, professional standards and practices by national standard setting organizations, and protocols and diagnostic tests approved by the Commissioner and set forth in N.J.A.C. 11:3–4.

(i) A medical review organization shall utilize audit procedures to ensure compliance with statutory and regulatory requirements.

(j) A medical review organization shall retain records of its determinations for five years.

**11:3–5.10  Medical review organization certification process**

(a) The Commissioner shall certify a medical review organization to provide medical review services in connection with the resolutions of PIP disputes if the Commissioner determines that the MRO complies with the standards set forth in N.J.A.C. 11:3–5.9 to provide an impartial review of the medical necessity or appropriateness of treatments, health care services or items of durable medical equipment for which medical expense benefits may be provided under personal injury protection coverage.

(b) For the purpose of obtaining certification by the Commissioner to act as a medical review organization to perform medical review in connection with the resolution of PIP disputes, an MRO shall submit two copies of a written application that sets forth the information in (b) below to:

Medical Review Organization Certification
New Jersey Department of Banking and Insurance

PO Box 325
Trenton, NJ 08625-0325

(c) The MRO application shall include the following:

1. A list of the names, addresses and specialties of the individuals health care providers, that will provide the medical review services. If the MRO will be limited in its service area, the application shall provide a map of the service area, including the providers by specialty;

2. A copy of the MRO's certificate of incorporation and by-laws;

3. A diagram of the MRO's organizational structure;

4. The location of the MRO's place of business where it administers its services and maintains its records;

5. A listing and biography of the MRO's officers and directors, or the individuals in the organization responsible for administration of medical reviews, including the medical director;

6. A detailed description of the MRO's experience in the review of medical care;

7. A description of its procedures for review of medical treatments, diagnostic tests and items of durable medical equipment in conjunction with PIP medical expense benefits;

8. A current list identifying all property/casualty insurers, health insurers, health maintenance organizations and health care providers with whom the MRO maintains any health related business arrangement. The list shall include a brief description of the nature of the arrangement, so as to permit the administrator to avoid assignments that may create a conflict of interest;

9. Such other information as the Commissioner may specifically request in connection with the certification of a particular applicant; and

10. A fee in the amount of $1,000 payable to the Department of Banking and Insurance.

(d) The materials specified in (c) above shall be retained by the Department and may be referred to the Department of Health and Senior Services for consultation as necessary. Any significant changes in the materials filed with the Department shall be reported as an amendment to the materials filed within 30 days of the change.

(e) The Department, in consultation with the Department of Health and Senior Services, shall review the materials and grant or deny certification within 45 days of receipt of a complete filing. The Commissioner may extend the time an additional 30 days for good cause shown, and shall notify the applicant of any extension. A decision to deny certification shall be in writing and include an explanation of the reason for the denial.

(f) Initial certification shall be effective for a period of two years. Certified MROs shall reapply for certification 90 days prior to expiration by submitting the items set forth in (b)1, 6, 7, 8, 9 and 10 above and any changes to items previously submitted in (b)2, 3, 4 and 5 above. Renewal certification may be effective for a period of up to five years.

(g) All data or information in the MRO's application for certification shall be confidential and shall not be disclosed to the public, except as follows:

1. The MRO's certificate of incorporation;

2. The MRO's address;

3. The names of the MRO's officers and directors, or the individuals in the organization responsible for the administration of medical reviews including the medical director; and

4. The date of certification of the MRO and date that certification expires.

(h) Upon certification, the Department shall advise the administrator of the name and address of the MRO, any limitations on its geographical service area and information about persons with whom it maintains health related business arrangements.

(i) The Commissioner may suspend or revoke the certification of an MRO upon finding that the MRO no longer meets the standards set forth in N.J.A.C. 11:3-5.9; that medical review services are not being provided in accordance with the requirements of this subchapter; or that the certification was granted based on false or misleading information.

1. Proceedings to revoke or suspend the certification shall be conducted pursuant to N.J.A.C. 11:17D.

2. Upon request of the MRO for a hearing, the matter shall be transferred to the Office of Administrative Law for a hearing conducted pursuant to the Uniform Administrative Procedure Rules, N.J.A.C. 1:1.

**11:3-5.11  Fees**

(a) (Reserved)

(b) When a mental or physical examination is performed in connection with the medical review organization's services, the health care provider performing the examination shall be paid the

fee provided for that service set forth on the Department's medical fee schedule, N.J.A.C. 11:3–29.

**11:3–5.12   Prohibition of conflicts of interest**

(a) No administrator or employee thereof, dispute resolution professional, medical review organization or reviewing health care provider shall have any personal or financial interest, direct or indirect, or engage in any business or transaction which is in conflict with the proper conduct of his or her duties under this subchapter.

(b) No administrator or employee thereof, dispute resolution professional, medical review organization or reviewing health care provider shall act in such capacity in any matter wherein he or she has a direct or indirect personal or financial interest that might reasonably be expected to impair his or her objectivity or independence of judgment.

(c) No administrator or employee thereof, dispute resolution professional, medical review organization or reviewing health care provider shall accept any gift, favor, service or other thing of value under circumstances from which it might be reasonably inferred that such gift, service or other thing of value was given or offered for the purpose of influencing him or her in the conduct of duties under this subchapter.

(d) No dispute resolution professional shall accept from any person, whether directly or indirectly and whether by him or herself or through a spouse or any family member or through any partner or associate or controlled business, any gift, favor, service, employment or offer of employment or any other thing of value which he or she knows or has reason to believe is offered with the intent to influence the performance of his or her duties as a dispute resolution professional.

(e) No dispute resolution professional shall make any determination in any PIP dispute in which he or she directly or indirectly

or through a spouse, family member or by partner or associate or controlled business has any personal or financial interest.